**UNITED STATES of America,
Plaintiff-Appellant,**

· v.

**ONE 1974 CADILLAC ELDORADO SE-
DAN, SERIAL No. 6L47S4Q407966,
Defendant-Appellee.**

**No. 68, Docket 76–6063.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 18, 1976.

Decided Jan. 13, 1977.

Peter C. Salerno, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty., S.D.N.Y., Samuel J. Wilson, Asst. U. S. Atty., New York City, of counsel), for plaintiff-appellant.

Michael P. Direnzo, New York City, for defendant-appellee.

Before WATERMAN, FRIENDLY and MULLIGAN, Circuit Judges.

MULLIGAN, Circuit Judge:

On October 15, 1974, the United States brought an action pursuant to 21 U.S.C. § 881 for the forfeiture of a 1974 Cadillac Eldorado Sedan registered in the name of Ivan Santiago. The Government sought forfeiture of the vehicle on the ground that it had been used to facilitate the sale of cocaine within the meaning of 21 U.S.C. § 881(a)(4). After a one-day bench trial before the Honorable Edward Weinfeld, United States District Court for the Southern District of New York, the court dismissed the complaint and denied forfeiture by order and judgment entered March 4, 1976. Judge Weinfeld's opinion, filed on December 30, 1975, is reported at 407 F.Supp. 1115. The Government has appealed.

The only evidence given below for the Government was the testimony of Joseph P. Salvemini, an undercover agent of the Drug Enforcement Administration, and two exhibits. The claimant Santiago testified on his own behalf. The Government does not contend that any of the findings of fact below are erroneous.

I

At about 1:30 p.m. on June 6, 1974, Salvemini and an informant went to the apartment of Arlene Carlton at 305 East 24th Street in Manhattan. They were there introduced to one "Pete" Montanez and discussed the purchase of cocaine. Montanez stated that he and his cousin Ivan (Santiago) had brought 15 kilos of cocaine from South America and had 3 kilos left. Montanez told Salvemini that he could only sell him an eighth of a kilogram. Salvemini protested that this was not enough and

after a heated exchange Montanez left. On the following day, June 7, Salvemini's informant advised him that another meeting had been scheduled at Carlton's apartment. Ivan Santiago, accompanied by Montanez, drove the Cadillac from his ladies' apparel shop on East 167th Street in the Bronx to Carlton's apartment in Manhattan where they met with Salvemini. Santiago stated that he was there to straighten out the prior disagreement and was willing to sell Salvemini one kilogram of cocaine for $26,000. They disagreed however as to the method of transferring the drugs. According to Salvemini, Santiago claimed to have been a dealer in cocaine for six years and preferred the exchange to be made indoors in Carlton's apartment, while Salvemini wished to use two rented cars. Salvemini testified that the price and the amount of cocaine to be sold were agreed upon at this meeting, and that their only difference at that point was the mechanics of the exchange. Santiago testified that at the end of the June 7 meeting, he told Salvemini to forget about it and that no agreement was reached.

Judge Weinfeld did not comment in his opinion on these separate versions of the June 7 meeting but did find that the meeting ended inconclusively and that the participants failed to agree on the mechanics of the transaction. Santiago and Montanez, after leaving the Carlton apartment, drove away in the Cadillac now sought to be forfeited. Three days later on June 10, 1974, Montanez met Salvemini at a New York restaurant where negotiations continued. Salvemini testified that Montanez stated that he and his cousin Ivan (Santiago) were adamant that the sale take place indoors. Salvemini then agreed to purchase an eighth of a kilogram of cocaine. The transaction took place that evening in the Carlton apartment, Salvemini paying Montanez $4,000 for the cocaine. By arrangement Salvemini and Montanez met the following day and agreed to the further sale of a kilogram of cocaine later that day. Before the transaction was consummated, however, Santiago and Montanez were both arrested.

The apartment of Santiago was searched on June 12 pursuant to a search warrant and quantities of cocaine and marihuana were seized, as well as narcotics equipment, plus some $26,629 in currency including $2,500 in $100 bills representing official advance funds. Later that day Santiago's Cadillac was seized. After Santiago's arrest, he was indicted and then pleaded guilty to conspiring with Montanez and Carlton to distribute cocaine in violation of 21 U.S.C. § 846. One of the overt acts charged in the indictment was the June 7 conversation in the Carlton apartment. Other overt acts charged were the purchase and sale of the one-eighth kilogram on June 10, 1974 by Montanez. Concededly the only use of the Cadillac Eldorado Sedan sought to be forfeited here was to transport Santiago and "Pete" Montanez to and from the Carlton apartment on June 7, 1974.

II

Section 881(a)(4) provides that the property subject to forfeiture includes "All conveyances, including aircraft, vehicles, or vessels, which are used, or are intended for use, to transport, or in any manner to facilitate the transportation, sale, receipt, possession, or concealment of property described in paragraph (1) or (2)." Paragraph 1 identifies a controlled substance as such property and there is no dispute that cocaine is such a substance.

The Government specifically relies on that part of the statute which provides that if the vehicle is used "in any manner to facilitate the . . . sale" of the controlled substance, it is subject to forfeiture. It is urged that the use of the Cadillac to bring Santiago and Montanez to the June 7 prearranged "business" meeting was a significant event in furtherance of Santiago's illegal activities which culminated in the illicit sale, thus justifying the forfeiture of the vehicle. Judge Weinfeld's opinion held that since the contraband was not transported by the vehicle and the car was used as an ordinary means of transportation to convey Santiago to the site of the June 7 meeting, there was no sufficient basis for

forfeiture. The court held that the vehicle must have a substantial connection to, or be instrumental in the commission of, the underlying crime. He found that the Cadillac here involved had no relationship, direct or indirect, to the subsequent narcotic transactions which transpired a few days later. He placed principal reliance on *United States v. One 1972 Datsun,* 378 F.Supp. 1200 (D.N.H.1974) which is the most recent case discussing the issue at length. There is no opinion of our circuit court in point. Although appellee has not favored us with a brief, the cases in point are not numerous and are discussed to a considerable extent in the *Datsun* opinion.

We cannot agree with the district court that the use of Santiago's Cadillac had no direct or indirect relationship to the subsequent sales. The June 7 meeting may have terminated inconclusively because of a disagreement as to the mechanics of the exchange, but it was an integral part of the drug selling conspiracy to which Santiago pleaded guilty and was pleaded in the indictment as an overt act. Salvemini did testify that the price and quantity of the drug were fixed at that meeting. It was the second meeting of Montanez and Salvemini and was prearranged as a result of the abortive meeting the day before. Santiago admittedly knew that the purpose of the meeting was to arrange for the sale of cocaine. That sale was consummated a few days later in the manner insisted upon by Santiago—an exchange in the apartment of Carlton. Santiago further admitted in the proceeding below that he had given the cocaine to Montanez which was sold to Salvemini on June 10, again an overt act pleaded in the indictment.

The question is whether there was a sufficient nexus between the use of the Cadillac to bring Salvemini and Santiago to and from the June 7 meeting to amount to a facilitation *in any manner* of the later sale of the controlled substance within the meaning of section 881(a)(4).

*United States v. One 1972 Datsun, supra,* relied upon by the district court, involved the construction of the same subdivision of

the statute on facts which appear to be stronger for the Government's case than those before us. That court nonetheless found them insufficient to justify the forfeiture of the vehicle. In that case Stoudt, the owner of the vehicle in question, on two occasions by prearrangement used his car to lead a special agent of the Drug Enforcement Administration (who followed in his own car) to Stoudt's apartment where sales of LSD were transacted. The court in its review of the case law found that this forfeiture statute and others similar to it had been limited to cases where a) the contraband, no matter how minute in quantity, was intentionally transported or concealed in the vehicle; b) where the vehicle was used as a place for conducting negotiations for or transacting any portion of a sale; or c) where the vehicle is used as a lookout or decoy vehicle in a convoy. The court noted that courts, with the exception of *United States v. One 1941 Pontiac,* 83 F.Supp. 999 (S.D.N.Y.1948), had been reluctant to expand the notion of "facilitation" beyond these categories. 378 F.Supp. at 1202–03 and n.6. From these cases, the court derived the rule followed below that "to be forfeited, a vehicle must have some substantial connection to, or be instrumental in the commission of, the underlying activity which the statute seeks to prevent." Id. at 1205. We cannot agree, in light of the language and intent of section 881(a)(4), that the statute should be so narrowly construed as to limit its application to the three categories set forth in *Datsun.*

The *Datsun* court, and Judge Weinfeld here, depend upon *Simpson v. United States,* 272 F.2d 229 (9th Cir. 1959), which in turn relied upon *United States v. Lane Motor Co.,* 344 U.S. 630, 73 S.Ct. 459, 97 L.Ed. 622 (1953), for the proposition that the mere fact that a car is used by a law violator for his personal convenience in transporting him to the site of the illicit operation does not establish a basis for forfeiture. Neither case however involved a construction of section 881(a)(4) which is here in issue. *Simpson* involved a forfeiture under 26 U.S.C. § 7302 which provides for the seizure of "any property intended

for use in violating the provisions of the internal revenue laws." The comparatively narrow scope of such statutes is clear from *Lane, supra,* 344 U.S. at 631, 73 S.Ct. at 460, where the Supreme Court, construing similar language in section 3116 of the 1939 Internal Revenue Code, held, "We think it clear that a vehicle used solely for commuting to an illegal distillery is not used *in* violating the revenue laws." (Emphasis in original). Section 881(a)(4) does not use the broad term property but specifically refers to vehicles and more pointedly, does not limit its application to the use of the vehicle in violating the narcotic laws but allows forfeiture where the vehicle is "used, or [is] intended for use . . . in any manner to facilitate the . . . sale" of a controlled substance. We cannot find these cases construing more restrictive statutes authoritative here. The issue cannot be resolved by the simple expedient of characterizing Santiago as a commuter or the user of a vehicle for personal convenience.

We also note that the *Datsun* opinion extensively cited and depended upon *United States v. United States Coin & Currency,* 401 U.S. 715, 91 S.Ct. 1041, 28 L.Ed.2d 434 (1971), as representing a trend of amelioration in forfeiture law and as holding that "property shall be seized only if its owner significantly participated in the criminal enterprise." 378 F.Supp. at 1204, quoting 401 U.S. at 719, 91 S.Ct. at 1044. However in *Calero-Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 688, 94 S.Ct. 2080, 2094, 40 L.Ed.2d 452 (1974), Mr. Justice Brennan writing the opinion for the Court stated: "*Coin & Currency* did not overrule prior decisions that sustained application to innocents of forfeiture statutes, like the Puerto Rican statutes, not limited in application to persons 'significantly involved in a criminal enterprise.'" The Puerto Rican statute there involved, P.R.Laws, Ann. tit. 24, § 2512, was modeled on section 881 and its facilitation language tracks precisely the language of the statute here involved. The claimant in *Calero-Toledo* was a lessor of a yacht who was unaware of the fact that his lessee was about to use it to transport marihuana. The Court nonetheless declared it properly seized and forfeited, noting that the appellee had not alleged or proved that it "did all that it reasonably could to avoid having its property put to an unlawful use." Id. at 690, 94 S.Ct. at 2095. This opinion therefore is hardly indicative of a trend of mollification even in circumstances where the owner of the forfeited vehicle is actually ignorant, albeit not invincibly so, of the use to which it has been put. Santiago, hardly a babe in the woods, was on the record before us a hardbitten and veteran trafficker in drugs who was not driving his Cadillac to the Carlton apartment to make a social call and exchange pleasantries with Salvemini.

The severe attitude of the *Calero-Toledo* Court is explained by its reference to the legislative history of 49 U.S.C. § 781,[1] which illustrates congressional concern with rising drug trafficking in this country and its conviction that those who profit and thrive upon the misery of drug addicts should be punished financially by forfeiture of the vehicles employed in the trade. The Government is also compensated in part for its enforcement efforts, which are substantial, and obtains security for subsequently imposed penalties and fines. Id. at 687 n.26, 94 S.Ct. at 2094 n.26.[2] There is there-

---

**1.** H.R.Rep. No. 2751, 81st Cong., 2d Sess. (1950) states:

Enforcement officers of the Government have found that one of the best ways to strike at commercialized crime is through the pocketbooks of the criminals who engage in it. Vessels, vehicles, and aircraft may be termed the operating tools of dope peddlers, and often represent major capital investments to criminals whose liquid assets, if any, are frequently not accessible to the Government. Seizure and forfeiture of these means of transportation provide an effective brake on the traffic in narcotic drugs. The proposed legislation is intended to provide additional means of combating this nefarious activity.
1950 U.S.Code Cong.Serv. 2952, 2953–54.

**2.** As *Calero-Toledo* notes, 416 U.S. at 680–81, 94 S.Ct. at 2090–91, the forfeiture statutes had their origin in the law of deodands where the value of the thing seized was forfeited to the King in the hope that the King would provide

fore reason to give the forfeiture provisions of the Comprehensive Drug Abuse Prevention and Control Act of 1970 broader coverage than those of other statutes depended upon in *Datsun* and the district court here.

It is interesting to note that 49 U.S.C. § 781(a)(3), the statute construed in the vast majority of the cases reported on this point in conjunction with the general forfeiture provision of the United States Code Chapter on Transportation, 49 U.S.C. § 782, provides for the forfeiture of any vehicle used or intended to be used "to facilitate the transportation . . . [or] sale . . . of any contraband article." However, when the Congress enacted section 881 as part of the 1970 Act it provided for the forfeiture of vehicles used or intended to be used *"in any manner* to facilitate the transportation . . . [or] sale" of a controlled substance. Although we have found no legislative history to explain the addition of the language which we have underscored,[3] its employment in a statute specifically addressed to the problem of drug abuse patently indicates the congressional intent to broaden the applicability of the forfeiture remedy it provided. Hence the rule proclaimed by *Datsun,* based upon other statutes as well as section 781, is perforce suspect.

While this circuit has not written on this point before, our attention has been called to opinions of two other circuits which are seemingly contrary to the result reached here. *Howard v. United States,* 423 F.2d 1102 (9th Cir. 1970), involved the seizure of a car used to transport the defendant to the scene of a drug transaction when the seizing officers had no cause to believe it contained contraband. The court found the forfeiture of the vehicle inappropriate. We note, however, that the court was construing section 781 and not its broadened counterpart section 881. Moreover, the Government proceeded on the theory that the vehicle facilitated the "transportation" of the drug and not, as here, its sale. *Howard* relied on *Platt v. United States,* 163 F.2d 165 (10th Cir. 1947) for the proposition that "The use of an automobile to commute to the scene of a crime does not justify the seizure of that automobile under sections 781 and 782." 423 F.2d at 1104. In *Platt,* the claimant of the vehicle was the mother of a drug addict who borrowed the vehicle from her parent to drive to a drug store to obtain morphine with a forged prescription. She was arrested as she left the store. Aside from the fact that the opinion indicates the mother's lack of awareness of the nature of her daughter's use of the car, the case again was based upon a forfeiture under section 781. We consider neither case therefore persuasive here.[4]

As a matter of common sense we cannot accept the concept that while the transportation of any quantity of drugs however minute is admittedly sufficient to merit the forfeiture of the vehicle, nonetheless the transportation of the trafficker to the site of the drug sale or to a prearranged meeting with a prospective customer where the sale is proposed should save the vehicle from forfeiture. In either event is should be *caput lupinum.* It is well understood that extremely small amounts of narcotics

money for Masses for the benefit or repose of the soul of the deceased. In O. Holmes, The Common Law 7 (1881) the origins of the remedy are traced to the Bible. The term deodand derives from Deo dandum (to be given to God). Whatever spiritual motivation inspired the development of the deodand, today forfeiture is candidly aimed at the pocketbook of the criminal and not his immortal soul, although his impoverishment might be a first step in his regeneration.

**3.** We note that this language was employed in the former Narcotic Drugs Import and Export Act, as amended, Act of July 18, 1956, ch. 629, § 105, 70 Stat. 570, which was repealed with the enactment of the Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub.L. No. 91–513, § 1101(a)(2), 84 Stat. 1291.

**4.** *United States v. One 1952 Ford Victoria,* 114 F.Supp. 458 (N.D.Cal.1953) relied upon by the district court below, also involved section 781, an innocent conditional vendor and again the Government proceeded on the theory that the conveyance of the trafficker facilitated the transportation of the drugs even though they were not physically present in the car.

are worth considerable sums. (Here for example one-eighth of a kilo of cocaine given to Montanez by Santiago, was sold to the Government agent for $4,000). The drug is physically small enough to be carried on the person of the peddler in his pocket or even his hat band. The vehicle is employed not as a moving van to cart bulky contraband, but realistically to facilitate the transportation of the person who deals in it. The nabobs of the drug business normally eschew physical custody of dope, relegating to their minions possession of the brown paper bag (here we note that while Santiago drove a Cadillac, his cousin Montanez drove a Toyota). If the purpose of the statute is, as Congress indicated, to reduce the profits of those who practice this nefarious profession, we are loathe to make the forfeiture depend upon the accident of whether dope is physically present in the vehicle. Its use to transport the peddler or his confederates to the scene of the sale or to a meeting where the sale is proposed is sufficient.

In prior cases decided under the more restrictive section 781, decisions of the Southern District have not hesitated to approve forfeitures where the vehicle was not used to transport or conceal contraband or as a place to negotiate or consummate a sale of drugs, but rather as a conveyance of the trafficker. In *United States v. One 1941 Pontiac Sedan, supra,* 83 F.Supp. 999, the vehicle was utilized by one Ardito to drive to a bar where he agreed to sell narcotics to a government informer. The next day he drove the car to a location where the transaction was to take place. A third party was observed carrying the conventional brown paper bag. When the informer advised Ardito that he did not have the money to make the purchase, Ardito waved away the bag carrier. Ardito was observed in the car with a confederate on one occasion and both were seen near it several times. In sustaining the forfeiture of the Pontiac Judge Leibell observed, id. at 1001:

> If an automobile is used by a drug peddler as a "means" of going to places to negotiate sales of narcotics and as a means of driving therefrom, to later on have the orders filled, and as a means for the joint transportation of himself and a confederate, who makes the delivery of the narcotics for the peddler, the automobile is in my opinion being used to facilitate the sale of narcotics, even though narcotics are not actually carried in the car.[5]

In an earlier case, *United States v. One Dodge Coupe,* 43 F.Supp. 60 (S.D.N.Y.1942), one Granza had driven his Dodge to a location in Manhattan where a Pontiac was parked. Granza entered the Pontiac, drove around the block, and then left it carrying a bag (color not disclosed) which it was subsequently established contained heroin. As a narcotic agent approached, Granza threw the bag back into the Pontiac. Although the claimant was a conditional vendor and the vehicle seized never was shown to have transported the drug, Judge Rifkind construing section 781(a)(3) found that the Dodge facilitated the transportation of the heroin because it brought Granza part of the distance over which the contraband would otherwise have had to travel in order to reach him, thus rendering his task less difficult and laborious. This answer he observed was in part prompted "by the inescapable inference which must be drawn from the fact that the meeting of the Dodge and the Pontiac was not accidental but prearranged. In other words the

---

**5.** In *Datsun, supra,* the court noted that the purpose of vehicle forfeiture in enforcement of the narcotics laws was to prevent the flow of narcotics by depriving peddlers of the operating tools of the trade. The court limited the penalty to vehicles used as part of the modus operandi of an ongoing criminal narcotics enterprise or a car specifically adapted for illegal narcotics activities. 378 F.Supp. at 1205. Judge Leibell, however, gave the remedy a much broader reading in *Pontiac, supra,* pointing out that the automobile permits the dope seller to be more elusive in going to places to meet customers and confederates, to move about at will, to travel greater distances, and to escape observation, detection and capture. He concluded, "It is an operating tool of the dope peddler's trade." 83 F.Supp. at 1002. We agree.

Dodge was an instrumentality in a prearranged scheme of transportation which was not completed by reason of the intervention of the narcotic agents." Id. at 62.

Both of these earlier Southern District decisions in substance support the position of the United States on this appeal, particularly since as we have noted we now are dealing with section 881(a)(4) which permits forfeiture if the vehicle *in any manner* facilitates the sale of a controlled drug. In *Dodge* Judge Rifkind observed, and Judge Weinfeld cited the opinion's language (although only for this statement), that where contraband is not in the vehicle, what constitutes facilitation "is a question of degree, which is in turn a question of fact not readily susceptible to generalization." 43 F.Supp. at 61. The facts here establish that Santiago and his confederate Montanez drove the Cadillac to a prearranged meeting on June 7 to discuss the sale of a controlled substance. That meeting did not result in an immediate sale but this is not unusual. Drug traffickers have to be wary of strangers until avarice ultimately overcomes vigilance. They drove back in the same vehicle. The deal was consummated a few days later by Montanez with drugs supplied by Santiago who knew they were to be sold to the agent. The transaction took place in the same apartment where Santiago initially met and discussed the sale to the agent. The conveyance of Santiago and Montanez in the Cadillac to and from the June 7 meeting did facilitate the sale of the drug, and for the reasons we have given was within the letter and the spirit of section 881(a)(4) of the statute. It has been suggested that on the basis of this decision, the Government may be encouraged to seize more vehicles of drug traffickers. So be it.

The order and judgment of the district court is reversed and the defendant Cadillac is decreed forfeited to the United States.