UNITED STATES of America, Plaintiff,

v.

ONE 1980 BMW 3201, V.I. No.
7154989, Defendant.

No. 81 CV 218 (ERN).

United States District Court,
E.D. New York.

March 9, 1983.

Raymond J. Dearie, U.S. Atty., E.D.N.Y. by Igou Allbray, Asst. U.S. Atty., Brooklyn, N.Y., for plaintiff.

Lawrence F. Spirn, Woodbury, N.Y., for defendant.

NEAHER, District Judge.

This case, which was tried on the facts without a jury, arises out of the government's seizure of claimant Brenda Segev's 1980 BMW automobile after she was arrested for her involvement in an illegal sale of 10,000 methaquaalone tablets. The government alleges that the BMW was used to facilitate the drug sale and should therefore be forfeited to the United States pursuant to 21 U.S.C. § 881(a)(4) and 49 U.S.C. § 782. After hearing the testimony of the parties and examining their exhibits, the Court makes the following findings of fact and conclusions of law. See Rule 52(a), F.R.Civ.P.

At 6:00 P.M. on September 29, 1980, undercover Drug Enforcement Administration ("DEA") Special Agents Edward Hamill and Evelyn Clark met with Debbie Norris, Michael Messinger and Seth Drusin at a prearranged location in Manhattan, New York, to negotiate the purchase of 10,000 methaquaalone tablets. Although the DEA agents agreed to a price of $2.00 per tablet, the deal ran into a snag on the question of payment: Messinger and Norris, who were acting as middlemen in the transaction, wanted the DEA agents to pay the $20,-000.00 before delivery of the tablets, while the DEA agents insisted upon a contemporaneous exchange of drugs and money. Before capitulating to this demand, Norris made several phone calls to her sources in Brooklyn ("Brenda and David") for clearance. After an hour of discussions, arrangements were finally made for Agents Hamill and Clark to take Messinger in their car and follow Norris and Drusin in Drusin's brown Toyota to a designated location in Brooklyn to conclude the purchase.

Before leaving Manhattan, however, Agent Hamill contacted Agent Thomas Ward, who along with several other DEA agents was observing the undercover operation, to inform him of the change in plans. During this conversation, Agent Hamill relayed Norris and Messinger's warning that the "main source" of the methaquaalone was apparently quite nervous about the new arrangements and would be conducting "counter-surveillance" during the transaction. Both Agent Hamill and Agent Ward took this to mean that someone, apparently the drug ring's ultimate supplier, would be in the area of the transaction watching for the presence of government vehicles or agents and consequently the back-up agents would have to operate with extra caution.

At approximately 8:00 P.M. the Toyota and the undercover vehicle along with the entourage of DEA automobiles left Manhattan and proceeded to the parking lot of the Rockaway Parkway-Seaview Avenue shopping center in Brooklyn. Upon arrival, the back-up agents took up their surveillance positions at various locations around the shopping center, while the undercover vehicle and the Toyota pulled into the parking area. After a short discussion with the undercover agents, Norris left the parking lot in the Toyota and, followed by back-up DEA Agents Fred Eisele and Stephen Moran, she drove to claimant's home at 105–31 Seaview Avenue where she picked up David Siegal. As Agents Eisele and Moran began to follow Norris and Siegal back to the shopping center, they observed a man, later identified as Harlan Schutzbank, exit 105–31 Seaview Avenue, enter claimant's BMW, and back it out into the street. The agents radioed the movements of the BMW to the other back-up DEA agents in the area, noting that the BMW was following their vehicle. Agent Jack Gillespie responded that he had the BMW under surveillance. Agents Eisele and Moran then continued on to the shopping center, leaving the BMW to Gillespie and his partner, Agent Ward.

According to Gillespie, whose vehicle was located across from the parking lot on Seaview Avenue, the BMW turned into the

shopping center shortly after the Toyota and stopped in a position to observe both the Toyota and the undercover vehicle. A short time later, the occupants of the Toyota and the undercover vehicle started their vehicles, left the parking lot and proceeded east on Seaview Avenue towards claimant's house, where the deal was to be consummated. At the same time, Gillespie watched the BMW pull out of the shopping center and proceed west on Seaview away from claimant's house, only to reappear traveling in the same direction as the Toyota and the undercover vehicle. Gillespie then started his own automobile and joined the procession to claimant's house.

At approximately 8:20 P.M., the undercover vehicle pulled into the driveway of 105–31 Seaview Avenue along with the Toyota, followed shortly by the BMW. At that time, David Siegal entered the house and returned with a brown paper bag, which he handed to undercover Agent Hamill. When Hamill observed a large quantity of white tablets in the bag, he gave the arrest signal and all the parties to the transaction, including claimant, were arrested, and the BMW was seized. A subsequent search of claimant's house and a vehicle owned by Schutzbank turned up another 10,000 methaquaalone tablets, as well as sundry other controlled substances.[1]

■ The central question in this case is whether the BMW was used in connection with the illegal sale of the 10,000 methaquaalone tablets. Under the federal forfeiture statutes a vehicle is subject to forfeiture if it is used "in any manner to facilitate the transportation, sale, receipt, possession or concealment of [contraband]." 21 U.S.C. § 881(a). Facilitation has been broadly construed to encompass any use or intended use of a vehicle which makes trafficking in contraband "less difficult and laborious;" there is no requirement that contraband be actually found within the vehicle. *United States v. One 1974 Cadillac Eldorado Sedan*, 548 F.2d 421, 426 (2d Cir. 1977); *accord United States v. Fleming*, 677

F.2d 602, 610 (7th Cir.1982); *United States v. One 1977 Cadillac Coupe DeVille*, 644 F.2d 500, 503 (5th Cir.1981); *United States v. One 1950 Buick Sedan*, 231 F.2d 219, 222 (3d Cir.1956). For example, courts have held that a vehicle is subject to forfeiture if it was used to transport confederates to a prearranged meeting where a sale is merely discussed, *United States v. One 1974 Cadillac Eldorado*, 548 F.2d at 426; or if it is used in "laying the groundwork" for the sale of contraband, *United States v. One 1979 Mercury Cougar XR–7*, 666 F.2d 228, 230 (5th Cir.1982); or if it is used as a lookout vehicle during the actual transaction, *United States v. One 1974 Cadillac Eldorado Sedan*, 548 F.2d at 423; *United States v. One 1975 Chevrolet K–5 Blazer*, 495 F.Supp. 737, 740 (W.D.Mich.1980); *United States v. One 1972 Datsun*, 378 F.Supp. 1200, 1202 (D.N.H.1974). Accordingly, it seems clear that if the BMW in this case was used for surveillance, as the government contends, then an order of forfeiture would be required.

■ To succeed in its contention under the federal forfeiture statutes, the government need only show that it had probable cause to believe that the BMW was used as a lookout vehicle during the September 29, 1980 drug transaction. Once probable cause has been shown, the burden of proof shifts to the claimant to rebut the probable cause showing and to demonstrate by a preponderance of the evidence that the vehicle was not used as the government asserted. 19 U.S.C. § 1615; *United States v. Fleming*, 677 F.2d at 609; *United States v. One Lincoln Mark V*, 453 F.Supp. 1388, 1391 (S.D.N.Y.1978).

■ "Probable cause" under the forfeiture laws essentially encompasses "the same standard employed to test search and seizures generally." *United States v. One Mercedes 280S*, 590 F.2d 196, 199 (6th Cir. 1978), *quoted in United States v. One 1976 Cadillac Seville*, 477 F.Supp. 879, 881 (E.D. Mich.1980). Thus, the government in this

---

1. Claimant subsequently plead guilty to a superseding misdemeanor charge of possessing a controlled substance in violation of 21 U.S.C. § 844(a).

case had to show that it had "reasonable grounds for belief of guilt supported by less than prima facie proof but more than a mere suspicion." *United States v. One 1975 Ford Pickup Truck,* 558 F.2d 755, 756 (5th Cir.1977), *quoted in United States v. One 1975 Chevrolet,* 495 F.Supp. at 746.

Applying this standard to the facts and circumstances of this case, it is clear that the government had probable cause to seize the BMW and hence probable cause to commence this action. Based on information supplied by two members of the drug ring, the DEA agents were aware that the ultimate source of the methaquaalone tablets would be conducting "counter-surveillance" during the actual transaction. This information, which was admissible on the issue of probable cause, Fed.R.Evid. 801(d)(2)(E); *see, e.g., United States v. Egan,* 501 F.Supp. 1252, 1271 (S.D.N.Y. 1980); *United States v. One 1975 Lincoln Continental,* 72 F.R.D. 535, 539–40 (S.D.N.Y.1976), alerted the agents to the possibility of a lookout vehicle. Given the movements of the BMW during the drug transaction, the agents could have reasonably believed that the car was being used as surveillance in an effort to detect an undercover operation before the prospective buyers were allowed to reach claimant's house and the actual drugs.

The claimant herself admitted, during deposition testimony, that Schutzbank had used her car with her permission at approximately 8:00 P.M., a time coinciding with the Toyota's departure from claimant's house. Agent Eisele's testimony established that immediately after the Toyota left 105–31 Seaview Avenue, Schutzbank pulled out in the BMW and followed Eisele's government vehicle to the shopping center. Agent Gillespie's testimony then placed the BMW in a position to observe the negotiations in the shopping center's parking lot. Further, both agents testified to the BMW following the Toyota and the government vehicles from the parking lot to claimant's home where the actual transaction took place. Finally, the subsequent discovery of 10,000 methaquaalone tablets in Schutzbank's car and claimant's own deposition testimony further established that Schutzbank was indeed the ultimate supplier of the drugs, thus fitting the description of the individual described by Messinger and Norris as the one who would conduct the "counter-surveillance."

In an effort to rebut the government's probable cause showing, the claimant contests the credibility of Agent Gillespie's eye witness testimony regarding the movements of the BMW. She contends that Agent Gillespie's testimony must be disregarded as unbelievable because of inconsistencies between his version of his surveillance positions and that contained in the report and testimony provided by Agent Moran. Both Agent Moran's report and testimony, which he admitted were not based on direct knowledge, reflected his belief that Agent Gillespie was parked on the east side of 105–31 Seaview Avenue, away from the shopping center, at the time the BMW was first noticed leaving that address. Based on this assumption, he testified that he thought Gillespie *followed* the BMW from 105–31 Seaview Avenue to the shopping center and then pulled off to avoid detection. Agent Gillespie, on the other hand, testified that he *observed* the BMW leave 105–31 Seaview and enter the shopping center from his position on Seaview Avenue across from the parking lot. He further testified that when the BMW left the parking lot, he did not follow it to avoid detection until the car reappeared heading towards claimant's house. Given the similarities between both versions of Agent Gillespie's movements, the absence of direct knowledge on the part of Agent Moran, and the inherent difficulty of one agent knowing the location of another agent during a complicated automobile surveillance operation, the disparities cited by claimant are neither remarkable nor indicative of a lack of credibility on the part of Agent Gillespie.

Moreover, Agent Moran's testimony and report does place the BMW within the proximity of both the shopping center and claimant's house during the crucial stages

of the negotiations. The precise location of the vehicle is in this case not determinative, rather its presence in the area, driven by the supplier of the drugs, coupled with prior information regarding the use of counter-surveillance, is sufficient. *See United States v. Fleming,* 677 F.2d at 610.

Claimant's final argument concerns the apparent uselessness of the surveillance alleged by the government. Even if the Court were to agree with this characterization, the proper method of performing surveillance, however, is not at issue here, but rather a sufficient showing of probable cause to seize the vehicle, which plaintiff has proven.

Having shown probable cause, the burden of proof shifted to the claimant to show by a preponderance of the evidence that the forfeiture statutes were not violated. Although claimant did not take the stand at the hearing, she did deny in deposition testimony that she gave Schutzbank permission to use her BMW in the narcotics transaction. Her lack of awareness as to the use of her vehicle, however, is not a valid defense to a forfeiture action. *See Calero-Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 683, 94 S.Ct. 2080, 2091, 40 L.Ed.2d 452 (1974); *United States v. One 1973 Buick Riviera,* 560 F.2d 897, 900 (8th Cir.1972). Where the owner of a vehicle has notice of a person's involvement in drug trafficking, but took no steps to avoid having her vehicle used for an unlawful purpose, the vehicle will be subject to forfeiture. *United States v. One 1978 Chrysler LeBaron Station Wagon,* 531 F.Supp. 32, 34 (E.D.N.Y.1981); *United States v. One 1976 Buick Skylark,* 453 F.Supp. 639, 643 (D.Colo. 1978).

In conclusion, the Court finds that the government has shown probable cause for the arrest of defendant BMW and claimant has failed to meet her burden of proof. Accordingly, an order of forfeiture must be entered against the 1980 BMW.[2]

---

**2.** Claimant argued at trial that the government's December 14, 1981 answers to her July 29, 1981 interrogatories and the deposition of claimant on December 14, 1981 delayed the trial and consequently violated claimant's right to due process of law. This claim is wholly without merit. Claimant's appropriate remedy, which she chose to ignore, was to move for an order to compel answers to her discovery requests. F.R.Civ.P. 37(a).

SO ORDERED.

The Clerk of Court is directed to enter judgment for the plaintiff directing that the defendant vehicle be condemned and forfeited to the benefit and use of the United States of America. The Clerk is further directed to forward copies of this Memorandum of Decision and Order to counsel for the parties.