UNITED STATES of America, Appellee,

v.

**1966 BEECHCRAFT AIRCRAFT MODEL KING AIR A90 CREAM WITH BURG & GOLD STRIPES SN:LJ–129, FAA REG:–333GG, EQUIPT, Defendant,**

and

Total Time Aircraft, Inc., Appellant.

UNITED STATES of America, Appellee,

v.

**1969 AEROSTAR AIRCRAFT MODEL 601, WHITE WITH RED STRIPES, SN:61–0021, FAA REG:N–7436S, EQUIPT, Defendant,**

and

Sundance Air, Inc., a Florida Corporation, Appellant,

and

John Gerald Gerant, President of said Corporation, Defendant.

Nos. 84–1944(L), 84–1945.

United States Court of Appeals, Fourth Circuit.

Argued April 4, 1985.

Decided Nov. 27, 1985.

Thomas F. Luken, Fort Lauderdale, Fla., for appellants.

John B. Grimball, Asst. U.S. Atty. (Henry Dargan McMaster, U.S. Atty., Columbia, S.C., on brief), for appellee.

Before MURNAGHAN, ERVIN and WILKINSON, Circuit Judges.

ERVIN, Circuit Judge:

Total Time Aircraft, Inc. ("Total Time") and Sundance Air, Inc. ("Sundance") seek the reversal of a district court's order of forfeiture of two of their aircraft under 21 U.S.C. § 881 (1982). Total Time, the operator of an airplane repair facility at the Fort Lauderdale-Hollywood International Airport in South Florida, is the owner of a 1966 Beechcraft airplane. Sundance, also a Florida corporation, is the owner of a 1969 Aerostar airplane. Because the district court found that these two airplanes were used to facilitate the transportation and sale of ten kilograms of cocaine in South Carolina in March, 1983, it ordered the forfeiture of the appellants' aircraft. Total Time and Sundance now appeal, asserting that (1) their right to a jury trial was improperly denied, (2) their property was not properly forfeitable under 21 U.S.C. § 881, and (3) insufficient evidence was adduced at trial upon which to base the forfeiture of their aircraft. We affirm the judgments of the district court.

## I.

Sometime shortly prior to February 25, 1983, a Drug Enforcement Administration ("DEA") informant in Greenville, South Carolina contacted DEA Special Agent Anthony Duarte concerning the possibility of a large cocaine sale in the area. The informant advised Duarte that he could arrange for a buy of ten kilograms of cocaine. Duarte instructed the informant to negotiate the buy and launched a large-scale DEA surveillance operation. The informant then arranged a deal with Joe Brown and Boyd Montgomery in Greenville to buy ten kilograms of cocaine, not less than 70% pure, for $500,000.00. However, before Brown and Montgomery would agree to the sale, they demanded that the informant prove he had sufficient funds with which to purchase the cocaine. Therefore, on February 25, 1983, undercover DEA Special Agents Dewey Gregory and Charles Schaming met Brown in a Columbia, South Carolina airport parking lot and showed him a duffle bag containing $500,000.00 in $20.00 bills.

Now convinced that the informant had enough money to buy the cocaine, Brown and Montgomery agreed to carry out the sale. On February 27, 1983, Montgomery left for Fort Lauderdale, Florida from Greenville to arrange for the cocaine purchase. He arrived on February 28. Later that same day, Montgomery met with Charles William Coddington, John Gerald Gerant and David Hampton Butler at Coddington's house in Fort Lauderdale. At that meeting, Coddington told Montgomery that Gerant and Butler were the actual cocaine suppliers in this deal while he was merely a middleman. Despite reservations about having to fly to South Carolina, Butler, Gerant and Coddington agreed to take part in the transaction.

The following day, March 1, 1983, Gerant delivered ten kilograms of cocaine to Coddington's house. At that time, Montgomery weighed the cocaine, checked its purity and placed it in a brown Samsonite suitcase. He then left the suitcase and the cocaine with Butler, Gerant and Coddington and departed.

The next day, March 2, 1983, Montgomery flew on a commercial airplane back to Greenville. Upon his arrival, Montgomery met with Brown and the informant to prepare for the actual exchange scheduled for later that day in Greenville. Meanwhile, during this same time, Gerant piloted a 1966 Beechcraft airplane from Fort Lauderdale to the Greenville-Spartanburg airport. Coddington flew with him in the plane. Circumstantial evidence also indi-

cated that the Beechcraft carried the Samsonite suitcase containing the ten kilograms of cocaine. On the same afternoon, Butler flew a 1969 Aerostar airplane from Fort Lauderdale to the Greenville downtown airport. Irving Hanna flew with him as his passenger.

Upon their arrival at the Greenville airports, Gerant, Coddington, Butler and Hanna rented two cars and rendezvoused as agreed at a Howard Johnson's Motor Inn in Greenville. At 7:00 p.m., Montgomery and the informant joined the four others at the Howard Johnson's. About an hour later, law enforcement officers arrested Gerant and Hanna as they drove away from the Motor Inn in a blue Cadillac. The officers searched the Cadillac pursuant to a search warrant, discovering the brown Samsonite suitcase containing ten kilograms of cocaine in the trunk.

Following these arrests and the seizure of the cocaine, officers moved to arrest Montgomery, Butler and Coddington at the Howard Johnson's. They entered the two rooms rented by the men and arrested Butler and Montgomery. Coddington escaped out a back door and remains a fugitive. A search of the two motel rooms uncovered a high speed electric money counter, a microscope, a .38 caliber revolver, a semi-automatic pistol owned by Butler, $4,960.00 in cash, and a marijuana cigarette found in one of Gerant's coats. In addition, a search of the Beechcraft airplane revealed documents indicating that Gerant and Butler were together aboard the plane in the Bahamas three months before, on December 16, 1982. After concluding that the

Beechcraft and the Aerostar were both used to facilitate this drug transaction, law enforcement officers seized the two airplanes under the authority granted by 21 U.S.C. § 881(b)(4).[1]

Subsequently, the government initiated forfeiture proceedings against Total Time Aircraft, the owner of the Beechcraft, and Sundance Air, the owner of the Aerostar, in federal district court pursuant to 21 U.S.C. § 881(d). The consolidated cases were tried by the district court without a jury on February 16, 1984. On June 13, 1984, the district court ruled that both aircraft were subject to forfeiture under 21 U.S.C. § 881(a)(4).[2]

Sundance Air is a Florida corporation wholly owned by its president and vice-president, John G. Gerant. Gerant's wife is the corporation's secretary-treasurer. The corporation's charter states that its corporate purpose is to lease aircraft and fly charters. However, the district court concluded that by transporting two of the drug conspirators Gerant "was utilizing the corporation's airplane as a part of an illegal scheme to facilitate the sale of cocaine." (JA 7-10). It found that "the Aerostar was used or was intended to be used to facilitate the sale, transportation, possession or concealment of cocaine and that the corporation ... had knowledge of this, by and through its president and owner." (JA 7-10, 11). As a result, the district court ordered the forfeiture of the Aerostar pursuant to subsection 881(a)(4).

Total Time Aircraft, Inc. is also a Florida corporation. It operates an airplane repair facility at the Fort Lauderdale-Hollywood

---

**1.** 21 U.S.C. § 881(b)(4) provides as follows:

Any property subject to civil or criminal forfeiture to the United States under this subchapter may be seized by the Attorney General upon process issued pursuant to the Supplemental Rules for Certain Admiralty and Maritime Claims by any district court of the United States having jurisdiction over the property, except that seizure without such process may be made when—...

(4) the Attorney General has probable cause to believe that the property is subject to civil or criminal forfeiture under this subchapter.

In the event of seizure pursuant to paragraph (3) or (4) of this subsection, proceedings under subsection (d) of this section shall be instituted promptly.

**2.** Under 21 U.S.C. § 881(a)(4), the United States has the authority to subject to forfeiture "... all conveyances, including aircraft, vehicles, or vessels, which are used, or are intended for use, to transport, or in any manner to facilitate the transportation, sale, receipt, possession, or concealment" of controlled substances and equipment used in manufacturing or distributing controlled substances.

International Airport. Total Time is owned 50% by David Seeright and 50% by his father, Virgil Seeright. David Seeright is the corporate president, Virgil Seeright the secretary-treasurer. David Seeright is a mechanic and is entrusted with the day-to-day operations of the corporation. Virgil Seeright is primarily an investor in the corporation and has no day-to-day responsibilities.

Total Time received title to the Beechcraft airplane involved in this case on September 28, 1982 from Mile High, Inc., a corporation owned and operated by Gerant, in exchange for the cancellation of a bill of $25,503.38 for work done by Total Time on the airplane. On several occasions thereafter, David Seeright permitted Gerant to use the Beechcraft. In particular, Seeright permitted Gerant to use the Beechcraft to fly Coddington to Greenville on March 2, 1983. The district court found that the Beechcraft also transported the ten kilograms of cocaine on this trip. Consequently, the district court concluded that because the Beechcraft had been used to transport two cocaine conspirators as well as the load of cocaine, it had been used to "facilitate the sale, transportation, possession or concealment of cocaine" in violation of 21 U.S.C. § 881(a)(4).

In addition, the district court found that, with respect to the Greenville trip,

> [David] Seeright did not ask about the purpose of the trip, or what cargo would be carried, required no signed contract, had no clear understanding as to when the plane would be returned, and received no money for its use. (Gerant was supposedly to pay $300.00 per hour but never has.) There was no flight plan filed and there was no insurance on the plane. In sum, the use of the plane by Gerant was handled in a most casual unbusinesslike manner by Total Time.

(JA 7–11, 12). Because the district court concluded that "Total Time did nothing to insure against the illegal use of its plane," (JA 7–12), it found that Total Time was not an "innocent owner" under the Supreme Court's decision in *Calero-Toledo v. Pear-*son *Yacht Leasing Co.*, 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974). As a result, the district court ordered the forfeiture of the Beechcraft to the United States.

Total Time and Sundance appeal these orders of forfeiture, asserting that (1) they were improperly denied a jury trial, (2) the airplanes do not constitute forfeitable property, and (3) insufficient evidence was introduced to support the order of forfeiture. We will address each of the appellants' arguments in turn.

II.

■ Total Time and Sundance first claim that they were improperly denied a jury trial in the proceedings below. After the government filed its complaints for forfeiture in rem on April 20, 1983, Total Time and Sundance both made a timely request for a trial by jury in their answers, filed May 13, 1983 and May 10, 1983 respectively. Despite their appearance before the district court at motions hearings on September 28, 1983 and February 6, 1984, at a roster meeting on January 3, 1984, and at the two-day bench trial on February 15–16, 1984, Total Time and Sundance made no further mention of a jury trial until after the district court's adverse ruling on June 13, 1984. Although the government concedes that each appellant made a timely demand for a jury trial in its answer pursuant to Fed.R.Civ.P. 38(b), the government contends that the appellants waived their right to a jury trial by failing to object to the district court's disposition of the case in a bench trial. We agree with the government's position.

As we stated in *Millner v. Norfolk & Western Railway Co.*, 643 F.2d 1005, 1011 (4th Cir.1981), "Rule 38(d) provides that if a proper demand for jury trial has been made, it cannot be withdrawn without the consent of all the parties, and under Rule 39(a)(1) this consent must be given by written stipulation or 'by oral stipulation made in open court and entered in the record.'" (citations omitted). Several courts have concluded that the right to a jury trial, once properly demanded, may be waived

only through strict compliance with the precise terms of Fed.R.Civ.P. 38(d) and 39(a). *See, e.g., Palmer v. United States,* 652 F.2d 893, 896 (9th Cir.1981) ("[w]e decline to create an exception to the precise terms of Federal Rules of Civil Procedure 38(d) and 39(a)...."); *DeGioia v. United States Lines Co.,* 304 F.2d 421, 424 n. 1 (2d Cir.1962). Other circuits, however, have held that Rules 38(d) and 39(a) are not to be so strictly interpreted. *See, e.g., Bass v. Hoagland,* 172 F.2d 205, 209 (5th Cir.), *cert. denied,* 338 U.S. 816, 70 S.Ct. 57, 94 L.Ed. 494 (1949) ("in a civil case a waiver [of the right to a jury trial after demand] is shown by mere acquiescience, when the party or his counsel is present and not objecting."); *see also Southland Reship Co. v. Flegel,* 534 F.2d 639, 645 (5th Cir. 1976); *National Family Insurance Co. v. Exchange National Bank,* 474 F.2d 237, 241 (7th Cir.), *cert. denied,* 414 U.S. 825, 94 S.Ct. 129, 38 L.Ed.2d 59 (1973); *Smith v. Cushman Motor Works, Inc.,* 178 F.2d 953, 954 (8th Cir.1950); *Wool v. Real Estate Exchange,* 179 F.2d 62, 63 (D.C.Cir. 1949). We believe the better rule is to recognize that "[t]he right to [a] jury trial may ... be waived by [the] conduct ... of the parties." 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2321 (1971).

In *Millner,* we concluded that general equitable principles do not serve to mandate a jury trial if the plaintiff was on notice that the trial court was planning to adjudicate the dispositive issues of fact in the case and did not object. *Millner,* 643 F.2d at 1011 n. 1. Because the plaintiff in *Millner* had no notice that the trial court was deciding the dispositive issues of fact in the evidentiary hearing in that case, this court held that equitable principles required a reversal of the district court's decision and a remand of the case for a trial by jury. However, in the case at bar, Total Time and Sundance were clearly aware that the district court was planning to decide the dispositive issues of fact in the case without a jury. Nevertheless, without objection, Total Time and Sundance fully and vigorously participated in the bench trial, making no mention of their early jury demand until this appeal. To permit the appellants to lodge an early demand for a jury trial and then, in effect, "ambush [the] trial judge" on appeal is patently unfair. *Palmer,* 652 F.2d at 897 (Chambers, J., dissenting). Consequently, we conclude that Total Time and Sundance waived their right to a jury trial by failing to object to the district court's decision to determine the dispositive issues of fact in this case without a jury or to in any way remind the district court of their early demand for a jury trial.

### III.

■ Total Time next argues that, as an "innocent owner" under the Supreme Court's decision in *Calero-Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974), it is exempted from the "broad sweep" of the forfeiture statutes. In *Calero-Toledo,* the Court concluded that forfeiture will not lie where an owner proves "not only that he was uninvolved in and unaware of the wrongful activity, but also that he had done all that could reasonably be expected to prevent the proscribed use of his property." *Id.* at 689, 94 S.Ct. at 2095.

In this case, David Seeright permitted Gerant to use the Beechcraft on a number of occasions without any inquiry as to where Gerant was flying the plane, what he was carrying, when he was returning, who he was flying with or for what purpose he was borrowing the airplane. Instead, Seeright basically gave Gerant free rein to use the plane as Gerant saw fit. This practice was not only very unbusinesslike but also was terribly unwise in an area such as South Florida where drug trafficking through the use of private aircraft flourishes. *See Comprehensive Drug Penalty Act: Hearings on H.R. 3272, H.R. 3299, and H.R. 3725 Before the Subcomm. on Crime of the House Comm. on the Judiciary,* 98th Cong., 1st Sess. 181–195 (1983) (statement of Stanley Marcus, United States Attorney for the Southern Dis-

trict of Florida) (hereinafter cited as *Hearings* ).[3]

In particular, with regard to the fateful trip to Greenville on March 2, 1983, Seeright again remained in the dark as to Gerant's plans and purposes when he loaned him the Beechcraft. And again, Seeright failed to ask Gerant any questions concerning the proposed use of the plane. Nor did he take even the slightest measures to prevent the illegal use of his airplane. Consequently, we conclude that the district court's determination that Seeright's "conscious indifference" to the use of his airplane did not establish that Total Time had done "all that it reasonably could to avoid having its property put to an unlawful use" was not clearly erroneous. *Calero-Toledo,* 416 U.S. at 689, 94 S.Ct. at 2094. Accordingly, the district court properly found Total Time not to be an "innocent owner" of the Beechcraft under *Calero-Toledo.*

### IV.

The appellants' final argument on appeal is that the government did not introduce sufficient evidence at trial to support the orders of forfeiture entered against both airplanes. We disagree.

#### A. *The Beechcraft*

Evidence was adduced at trial in the form of detailed testimony from Boyd Montgomery, an admitted co-conspirator of Gerant, pursuant to a plea agreement, that the Beechcraft was used to transport conspirators Gerant and Coddington as well as the ten kilograms of cocaine to Greenville. DEA agents corroborated various aspects of Montgomery's testimony. On the basis of this testimony, the district court found that the Beechcraft airplane carried the two drug conspirators and the cocaine to Greenville. These findings of fact are not clearly erroneous. *Anderson v. City of Bessemer City,* —— U.S. ——, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985).[4] Since the district court did not err in determining that the Beechcraft airplane transported Gerant, Coddington and the ten kilograms of cocaine, forfeiture was proper under 21 U.S.C. § 881(a)(4).

#### B. *The Aerostar*

The government does not argue that the Aerostar carried cocaine to South Carolina. Rather, it contends, as the district court found, that the Aerostar facilitated the drug conspiracy by transporting two of the conspirators to the site of the exchange and, as a result, was properly forfeitable under 21 U.S.C. § 881(a)(4).

The circuits are divided over whether the language in 21 U.S.C. § 881(a)(4) subjecting to forfeiture "all conveyances, including aircraft, vehicles, or vessels, which are used, or are intended for use, to transport, or in any manner to facilitate the transportation, sale, receipt, possession or concealment" of controlled substances may reach vehicles and aircraft used only to transport conspirators to the site of a drug transaction and not to transport the controlled substances themselves. The First, Ninth and Tenth Circuits have concluded that "subsection 881(a)(4) by its terms lays down a *per se* forfeiture rule only for transportation of certain items of contraband," not for the mere transportation of suspected conspirators. *United States v.*

---

**3.** United States Attorney Marcus noted that:

South Florida is the main point of entry into the United States for cocaine, marijuana and methaqualone, and is a wholesale center for American trade in these drugs, a trade which generates a cash exchange of billions of dollars annually. The primary source for this illegal importation is Colombia. In addition to the illegal drug trade itself, up to one-half of many other kinds of crime, especially violent crime, is drug related. Thus, South Florida has a crime problem unique in the nation, if not the world.

*Hearings* at 181.

**4.** As the Supreme Court ruled in *Anderson,*

when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error.

105 S.Ct. at 1513.

*One 1972 Chevrolet Corvette,* 625 F.2d 1026, 1028 (1st Cir.1980); *see also Howard v. United States,* 423 F.2d 1102, 1104 (9th Cir.1970); *Platt v. United States,* 163 F.2d 165, 167 (10th Cir.1947). However, the Second, Fifth and Eleventh Circuits have determined that forfeiture is proper where the vehicle only transports the drug dealer to the site of a proposed exchange. *See United States v. One 1979 Porsche Coupe,* 709 F.2d 1424, 1427 (11th Cir.1983); *United States v. One 1979 Mercury Cougar,* 666 F.2d 228, 230 (5th Cir.1982); *United States v. One 1977 Cadillac Coupe DeVille,* 644 F.2d 500, 503 (5th Cir.1981); *United States v. One 1974 Cadillac Eldorado Sedan,* 548 F.2d 421, 427 (2d Cir.1977).

In resolving this dispute, the legislative history instructs that "it is the intent of these provisions that property would be forfeited only if there is a substantial connection between the property and the underlying criminal activity." Psychotropic Substances Act of 1978, Joint Explanatory Statements of Titles I and II, 95th Cong., 2d Sess., *reprinted in* 1978 U.S.Code Cong. & Ad.News 9496, 9518, 9522. It is our conclusion that the use of an airplane or other vehicle or vessel in a drug transaction, either to transport controlled substances or to transport conspirators to an exchange site, establishes a "substantial connection" between the conveyance and the criminal activity sufficient to justify an order of forfeiture.

The private airplane has today become an important tool of the drug trafficker.[5] It is obvious that it facilitates transportation to a much greater degree than an automobile. In addition to permitting drug traffickers to canvas greater areas in less time, the airplane's ability to surreptitiously arrive and depart quickly and easily has made the capture of drug traffickers even more difficult. Indeed, the use of airplanes may make possible drug deals which very well might otherwise be impossible to complete because of time constraints and long dis-

tances. *See generally* Aviation Drug-Trafficking Control Act, S.Rep. No. 228, 98th Cong., 1st Sess., *reprinted in* 1984 U.S. Code Cong. & Ad.News 3916.

Consequently, we hold that the use of an airplane or other vehicle or vessel to transport conspirators to the scene of a drug sale subjects that conveyance to forfeiture under 21 U.S.C. § 881(a)(4). We agree with the Second Circuit that

> if the purpose of the statute is, as Congress indicated, to reduce the profits of those who practice this nefarious profession, we are loathe to make the forfeiture depend upon the accident of whether dope is physically present in the vehicle. Its use to transport the peddler or his confederates to the scene of the sale or to a meeting where the sale is proposed is sufficient.

*One 1974 Cadillac Eldorado Sedan,* 548 F.2d at 426; *see also United States v. One 1979 Lincoln Continental,* 574 F.Supp. 156, 159–160 (N.D.Ohio 1983), *aff'd,* 754 F.2d 376 (6th Cir.1984).

Since we conclude that the district court's finding that the Aerostar transported two of the conspirators to the site of the drug transaction is not clearly erroneous, *Anderson,* 105 S.Ct. at 1512, we rule that the Aerostar was properly forfeited under 21 U.S.C. § 881(a)(4).

## V.

Accordingly, for the foregoing reasons, the judgments of the district court are

AFFIRMED.

---

5. Between January 1, 1982 and May 19, 1983, DEA agents made drug-related seizures of 53 aircraft with a total value of $8,858,922. During the same period, 1906 vehicles worth $15,092,142 and 80 vessels worth $6,685,750 were also seized. *Hearings, supra* at 216.