UNITED STATES of America Appellee,

v.

Wayne GASKIN, aka "Atiba," and Al
Castle, Defendants–Appellants.

No. 02–1070, 02–1186.

United States Court of Appeals,
Second Circuit.

Argued: Oct. 31, 2003.
Decided: April 16, 2004.

Edwin S.C. Obiorah, Rochester, NY, for Defendant–Appellant Gaskin.

Eftihia Bourtis, Assistant Federal Defender, Western District of New York, Webster, NY, for Defendant–Appellant Castle.

Everardo A. Rodriguez, Assistant United States Attorney, Western District of New York, Rochester, NY (Michael A. Battle, United States Attorney), for Appellee.

Before: FEINBERG, KEARSE, and RAGGI, Circuit Judges.

RAGGI, Circuit Judge.

Defendants-appellants Wayne Gaskin and Al Castle were found guilty after a jury trial in the United States District Court for the Western District of New York (Charles J. Siragusa, *Judge* ) of conspiracy to traffic in 100 kilograms or more of marijuana (Count One), *see* 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(B)(vii), and of possession with intent to distribute and distribution of 100 kilograms or more of marijuana in April 1999 (Count Two), *see id.* § 841(a)(1), 841(b)(1)(B)(vii); 18 U.S.C. § 2.[1] Gaskin was also found guilty on a separate substantive charge of possession with intent to distribute an unspecified quantity of marijuana between May 1999 and June 17, 1999 (Count Six). *See* 21 U.S.C. § 841(a)(1); 18 U.S.C. § 2. Further, Gaskin was ordered by the district court to forfeit approximately $20,000 in cash seized at the time of his arrest (Count Eight). *See* 21 U.S.C. § 853(a)(2).

Both defendants now appeal from final amended judgments of conviction entered on March 14, 2002, against Castle and on February 7, 2003, against Gaskin. Pursuant to these judgments, defendants are presently incarcerated, Castle serving a total term of 46 months and Gaskin serving a total term of 204 months.

Defendants assert that the trial evidence was insufficient to support their convictions and that the district court erred in failing to declare a mistrial based on jury misconduct. In addition, Gaskin argues that the district court erred in refusing to dismiss the indictment against him for violation of the Speedy Trial Act's thirty-day filing requirement, *see* 18 U.S.C. § 3161(b); refusing to suppress evidence seized in a warrantless search of his car; declining to give a missing witness charge; ordering forfeiture of money seized at his

arrest; and increasing his Sentencing Guidelines base offense level for use of a minor in the commission of a crime, *see* U.S.S.G. § 3B1.4, obstruction of justice, *see id.* § 3C1.1, possession of a firearm in connection with a drug trafficking offense, *see id.* § 2D1.1(b)(1), and involvement as an organizer or leader of criminal activity involving five or more participants, *see id.* § 3B1.1(a). Castle further challenges his conviction on the ground that his trial attorney was constitutionally ineffective.

For the reasons stated herein, we reject each of these claims and, accordingly, AFFIRM both convictions.

## I. *Factual Background*

Between the spring of 1998 and June 1999, Wayne Gaskin organized and financed the transportation of hundreds of kilograms of marijuana from the western part of the United States to Rochester, New York, where he then distributed the contraband. In making arrangements to acquire the marijuana and to have various couriers transport it by air, train, and motor vehicle to Rochester, Gaskin was assisted by numerous individuals, including co-defendant Al Castle. To prove defendants' participation in the charged conspiracy, the government relied on the testimony of three couriers—Bonnie Gahr, Kevin Miller, and Theodore Shaw—corroborated by voluminous credit card, telephone, airline, car rental, and hotel records. The same evidence was also relied on to prove the substantive marijuana charges, each charge relating to a specific marijuana transportation by one of the couriers. Thus, Count Two charged defendants in connection with Gahr's effort to transport approximately 285 pounds of marijuana by car from San Diego, California, to Rochester in April 1999; Count Three charged

---

1. A third defendant, Ralph Cruickshank, Jr., charged only with participation in the marijuana conspiracy, was acquitted on that single count.

Gaskin in connection with Miller's transportation of an unspecified quantity of marijuana by train from San Diego to Rochester sometime between April and May 1999; Count Four charged Gaskin in connection with a similar transportation of marijuana by Miller in May 1999; Count Five charged both Gaskin and Castle with another Miller transportation of marijuana in June 1999; and Count Six charged Gaskin in connection with Shaw's efforts to transport eighty-six pounds of marijuana by motor home from Phoenix, Arizona, to Rochester between May and June 1999. On Counts Two and Six, for which there were corroborating drug seizures, the defendants were convicted. On Counts Three, Four, and Five, for which there were no corroborating seizures, they were acquitted.

Because defendants raise sufficiency challenges to the counts of conviction, we outline the relevant evidence in some detail.

### A. Bonnie Gahr's Transportation of Marijuana

#### 1. The Suitcase Transports

Bonnie Gahr testified that she had already known Gaskin for almost six years when, in the spring of 1998, he proposed that she fly to San Diego to pick up a suitcase containing marijuana and transport it back to him in Rochester. Gaskin promised to pay Gahr $1,000 or two pounds of marijuana for her efforts and to cover her travel expenses. Gahr accepted the offer and, following Gaskin's instructions, she flew to San Diego where she met with a man, "Mundahla," who packed fifteen to thirty plastic-wrapped bundles of marijuana into a suitcase. Upon Gahr's return to Rochester, Gaskin promptly came to her home to retrieve the suitcase, traveling in a black pickup truck driven by an African–American male. In a post-conviction proffer session with the government, defendant Castle would identify this man as "Sammy."

Throughout the spring and summer of 1998, Gahr traveled between Rochester and San Diego some five to ten times, transporting marijuana in suitcases for Gaskin on each occasion. On two or three of these trips, Gahr also acted as a reverse courier, carrying sums of cash as large as $25,000 from Gaskin to Mundahla.

#### 2. The Truck Transport (Count Two)

In April 1999, Gaskin proposed to Gahr that she and her boyfriend (subsequently her husband), Ron Ruffin, drive truckloads of marijuana from San Diego to Rochester once a month over the next six months. Gaskin offered to supply the truck, to cover the couple's travel expenses, and to pay them $5,000 for each successful marijuana delivery.

On April 14, 1999, Gaskin brought a GMC Yukon truck to Gahr's home. Business records indicated that the Yukon, which was registered to Gahr, had recently been purchased in the name of one of Gaskin's in-laws. Gaskin supplied Gahr and Ruffin with $2,000, a map outlining their route to San Diego, and a walkie-talkie. The trio then drove to the entrance of the New York State Thruway where defendant Castle was waiting in a minivan. Gaskin got out of the Yukon, joined Castle in the minivan, and the two vehicles began to drive in tandem to California.

The next day, as the conspirators were traveling through Kansas, a state trooper spotted the two vehicles and stopped the minivan for a traffic violation. At trial, the trooper identified Gaskin as the driver of the van and testified that Gaskin had denied that the van and Yukon were traveling together. When the trooper subse-

quently stopped the truck, he noted several empty duffle bags in the vehicle.

As a result of the Kansas stops, the truck and minivan became separated, and it was not until the morning of April 17 that Gahr, Ruffin, Gaskin, and Castle reunited in San Diego. Gaskin assured his confederates that the Kansas trooper had not discovered that he was carrying $150,000 in cash. Nevertheless, Gahr expressed reservations about continuing with the marijuana scheme now that their vehicles were known to law enforcement authorities. She testified that all three men dismissed her fears and persuaded her to go forward with an alternative plan whereby she and Ruffin would drive back to Rochester by an alternate route, transporting the marijuana in a different vehicle.

That same night, the four conspirators went to a National Rental Car office. While Gahr, Ruffin, and Gaskin waited outside, Castle entered the agency and rented a Buick sedan, a transaction confirmed at trial through rental company records and Castle's credit card receipts. Gaskin and Castle drove off in the Buick, leaving Gahr and Ruffin to return in the Yukon to their hotel. The next morning, Gaskin told Gahr and Ruffin that the Buick was packed and ready for their return trip to Rochester. The couple left San Diego that day, leaving the Yukon with Gaskin.

Two days later, on April 20, while traveling through Illinois, Gahr and Ruffin were stopped by a state police officer who discovered approximately 285 pounds of marijuana concealed in the trunk of the Buick. Both Gahr and Ruffin were arrested. Although Ruffin was detained, Gahr was released on bail.

### 3. *Post–Arrest Contact with Gaskin*

After her release, Gahr promptly contacted Gaskin, who had not yet returned to Rochester, to tell him of the arrests and to ask for money to help her get back to New York. Gaskin wired $300. In Rochester, Gaskin told Gahr that money was then tight because the Illinois seizure had cost him $150,000 but, if she and Ruffin would keep their "mouth[s] shut," he would see that they were taken care of for the rest of their lives. Trial Tr., Sept. 6, 2001, at 198–99. Gaskin reported that he already had an attorney, Mustapha Muhammad, looking into the Illinois case against Ruffin, and he gave Gahr $4,000 to defray her own defense costs.

In discussions with Gahr over the next few months, Gaskin told her that another courier—later identified by authorities as Kevin Miller—had recently reported a lost shipment of marijuana, but that Gaskin did not believe him. Gaskin stated that he knew where this courier's sister lived and planned to retaliate by "shoot[ing] up" her home. *Id.* at 206. After Gaskin's own June 17, 1999 arrest, *see infra* at Part I.C.2, he told Gahr that he planned to kill another courier—Theodore Shaw—who had cooperated with authorities against him, describing the individual as "a dead man walking." *Id.* at 210. Gahr testified that she knew Gaskin had a gun because she had seen one in his waistband on one of the occasions when he had come to her home to retrieve marijuana.

### B. *Kevin Miller's Transportation of Marijuana* [2]

#### 1. *Miller Refers Gaskin to a Lawyer to Assist in the Gahr/Ruffin Case*

Kevin Miller testified that he met Gaskin in April 1999, when the two men were

---

**2.** Although defendants were acquitted on the substantive counts (Three, Four, and Five) relating to Miller's transports, we summarize his testimony because the jury may have found it credible as to the existence of the overall conspiracy or corroborative of parts of Gahr's testimony.

coincidentally traveling together by train from California to Chicago. Gaskin confided that he was in the marijuana business and that two of his couriers had recently been arrested in Illinois. Miller recommended Chicago lawyer Mustapha Muhammad and used Gaskin's cell phone to call Muhammad from the train. Gaskin's telephone records corroborated this call and also showed repeated calls at about the same time from the cell phone to defendant Castle. In Chicago, Gaskin and Miller met with Muhammad, after which Gaskin paid Miller $200 to visit Ruffin (which Miller did not do), before Gaskin boarded a train for Rochester. According to telephone records, Gaskin's first cell phone call upon arriving in Rochester was to Castle.

### 2. *Miller's Two Successful Marijuana Transports (Counts Three and Four)*

A few days later, when Miller arrived in Rochester, Gaskin offered to pay him $2,000 per trip to transport marijuana from San Diego. Miller testified that on his first trip, on April 29, 1999, he and Gaskin flew to Los Angeles where they picked up a Yukon truck and drove to San Diego. There, a supplier gave Gaskin two suitcases full of marijuana. Leaving the truck with the supplier, Gaskin and Miller returned to Rochester by train. At the Rochester station, Gaskin and Miller were met by a male in a black pickup truck—presumably "Sammy"—who retrieved the suitcases and drove away, leaving Gaskin and Miller to depart the station in Gaskin's sport utility vehicle.

Miller made a second trip to San Diego in May 1999. Once again, Gaskin flew with him to California, but while Miller transported the suitcases full of marijuana back to Rochester by train, Gaskin returned by air. Once again, the man in the pickup truck met Miller at the station and took the suitcases.

### 3. *Miller's Unsuccessful Third Marijuana Transport (Count Five)*

Miller's final trip for Gaskin began on June 8, 1999, in Phoenix. Gaskin had directed Miller to meet him in Phoenix because Gaskin was there finalizing arrangements for a separate marijuana shipment—subsequently transported by Theodore Shaw, *see infra* at Part I.C.1. Miller and Gaskin drove overnight from Phoenix to San Diego. There, at Gaskin's direction, Miller made travel reservations for Castle to fly to San Diego to bring Gaskin additional money to pay his California marijuana supplier. Miller testified that after Castle arrived in San Diego, he and Gaskin went out together, returning with a quantity of marijuana that they repackaged to fit inside a number of suitcases. As the three men were leaving the hotel with the suitcases, Gaskin introduced Miller to a woman named "Julie," who he explained would also be acting as a courier.

Miller testified that he traveled by train with Julie and the suitcases full of marijuana as far as Emeryville, California. There, Miller left the train, caught a taxi to the San Francisco airport, and flew to Chicago. At trial, he explained these actions by saying he had "personal things" to attend to in Chicago. Trial Tr., Sept. 21, 2001, at 1570. A few days later, Miller went to the Chicago station to meet Julie's train, but neither she nor the suitcases were on board. When Miller reported these events to Gaskin, Gaskin accused him of stealing the marijuana and threatened to harm Miller's family. Miller threatened similar violent retaliation against Gaskin. Instead, Miller contacted Illinois law enforcement authorities and offered his cooperation against Gaskin.

## C. *Theodore Shaw's Transportation of Marijuana (Count Six)*

### 1. *The Motor Home Transport*

Theodore Shaw testified that he had been a marijuana customer of Gaskin's for several months when, in May 1999, Gaskin proposed that Shaw drive a motor home containing marijuana from Phoenix to Rochester in return for $2,000—$1,000 in advance and $1,000 upon delivery.

Accepting Gaskin's offer and following his directions, Shaw rented a motor home in Rochester and drove to Phoenix, arriving on June 8, 1999. That day, Gaskin met Shaw at a Phoenix motel to arrange for the motor home to be driven to the loading location. Shaw told Gaskin that a set of keys was inside the vehicle and that Gaskin could move it to wherever he wished. Later that evening, Gaskin called Shaw to tell him he could leave. The next morning, Shaw began to drive the motor home back to Rochester.

On June 11, Shaw was stopped by Oklahoma state highway authorities, who found four bundles of marijuana, weighing approximately eighty-six pounds, hidden underneath the motor home's bed frame. While placing Shaw under arrest, the officers seized a cell phone whose number was assigned to Gaskin.

### 2. *The June 17, 1999 Controlled Delivery*

Shaw agreed to cooperate with the Federal Bureau of Investigation in making a controlled delivery of the marijuana. On June 17, 1999, Shaw placed a monitored, recorded telephone call to Gaskin reporting his arrival in Rochester and cautioning that the "stuff" was beginning to smell. The two men agreed to meet a few hours later in the parking lot of a Carvel ice cream store.

FBI agents who surveilled the meeting testified that Gaskin arrived at the parking lot in a Honda Accord, accompanied by his seventeen-year-old son. Leaving his son in the car, Gaskin walked over to Shaw and asked the courier how he was going to get home. Shaw, who was recording their conversation by means of a concealed body wire, responded by asking Gaskin how long he needed the motor home and offering to pass the time in the ice cream store. When Shaw inquired about payment, Gaskin assured him that he had the money with him, whereupon Shaw gave Gaskin a set of keys. As Gaskin got in the driver's seat of the motor home and tried to start the vehicle, federal agents placed him under arrest.

### 3. *The Searches of Gaskin's Person and Automobile*

Incident to arrest, agents searched Gaskin and seized $3,895 in cash and a cell phone. Telephone records showed that the seized cell phone was the device used to contact various co-conspirators at times pertinent to the different marijuana transports. FBI agents also searched Gaskin's Honda, seizing $16,000 in cash from a shoe box found in the trunk of the car, as well as various papers linking Gaskin to "M.A. Muhammad," "Mustafa Muhammad," "Kevin Miller," and "Bonnie." Initially agreeing to speak with federal authorities, Gaskin disclaimed any knowledge of the seized $16,000 and stated that the money did not belong to him. He further denied having recently been in Phoenix.

## D. *The Criminal Complaint Against Gaskin and Subsequent Indictment*

Later that same day, Gaskin was arraigned in the United States District Court for the Western District of New York on a criminal complaint charging:

On or about June 4 and June 17, 1999[,] ... defendant did, agree and conspire with another individual to have a quanti-

ty of marijuana ... transported from the State of Arizona to Rochester, New York, and did then attempt to possess said marijuana with intent to distribute it in violation of Title 21 United States Code, Sections 846 and 841(a)(1).

Compl. at 1. The only conspiratorial agreement described in the supporting agent's affidavit is the one between Gaskin and Shaw to transport a single load of "approximately 100 pounds" of marijuana from Arizona in June 1999. Compl. Aff. ¶¶ 9–10. Similarly, the only attempted possession of marijuana referenced in the affidavit relates to the four bundles concealed in the motor home.

Gaskin pleaded not guilty to the complaint and was detained. Six days later, on June 23, he was released on bail subject to electronic monitoring. No indictment was returned within thirty days of Gaskin's arrest; nor did the government move to dismiss the complaint within that time. Instead, the docket sheet indicates that in early August 1999, Gaskin changed counsel, and through October of that year, the parties wrangled over the conditions of Gaskin's continued release. Thereafter, no filings or court proceedings are noted until November 21, 2000, when Gaskin moved to dismiss the complaint for violation of the Speedy Trial Act's requirement that an indictment be filed within thirty days of arrest. *See* 18 U.S.C. §§ 3161(b), 3162(a)(1).

In fact, that same day, the grand jury voted a sealed indictment charging Gaskin, Castle, and Cruickshank with participation in a broad marijuana transportation conspiracy spanning almost two years and involving more than 100 kilograms of contraband. With respect to the Shaw transport, Count Six of the indictment charged Gaskin with actual possession of the marijuana in the motor home, rather than the attempted possession charged in the complaint.

In an omnibus defense motion filed March 1, 2001, Gaskin renewed his Speedy Trial Act challenge to his prosecution, this time seeking dismissal of the indictment—or at least the charges contained in Counts One and Six. Relying on this court's decision in *United States v. Napolitano*, 761 F.2d 135, 137–38 (2d Cir.1985), the district court declined to dismiss the indictment, finding that the charges contained therein were not the same as those alleged in the complaint. Specifically, the court ruled that the marijuana possession charged in Count Six was not "the same offense" as the attempted possession charged in the complaint. Trial Tr., June 21, 2001, at 7. Further, applying factors relevant to double jeopardy review of successive conspiracy charges, *see United States v. Korfant*, 771 F.2d 660, 662 (2d Cir.1985) (per curiam), the court concluded that the marijuana conspiracy charged in Count One was not the same conspiracy charged in the complaint. *See United States v. Gaskin*, 00–CR–6148, 2002 WL 459005, at *4–*7 (W.D.N.Y. Jan.8, 2002).

## II. *Discussion*

### A. *Speedy Trial Act*

■ Gaskin submits that the district court erred in refusing to dismiss the charges in Counts One and Six of the indictment for violation of the Speedy Trial Act's thirty-day filing requirement. *See* 18 U.S.C. §§ 3161(b); 3162(a)(1). We review the district court's findings of fact as they pertain to a speedy trial challenge for clear error and its legal conclusions *de novo*. *See United States v. Paredes–Batista*, 140 F.3d 367, 374 (2d Cir.1998) (citing *United States v. Simmons*, 786 F.2d 479, 483 (2d Cir.1986)).

"The administration of justice depends heavily upon the prompt processing of criminal proceedings," both to safeguard the rights of the accused and to promote

public respect for and confidence in the law. *United States v. Hillegas*, 578 F.2d 453, 456 (2d Cir.1978); *accord United States v. Breen*, 243 F.3d 591, 594 (2d Cir.2001); *United States v. Kelly*, 45 F.3d 45, 47 (2d Cir.1995) (per curiam). Toward this goal, Congress enacted the Speedy Trial Act of 1974, 18 U.S.C. § 3161 *et seq.*, which provides for dismissal of charges against a defendant who is not indicted, arraigned, or brought to trial within periods of time set forth in the statute. *See id.*

▮▮▮ Section 3161(b), invoked by Gaskin in this case, states that "[a]ny information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges." *Id.* § 3161(b). The sanction for a § 3161(b) violation is set forth in § 3162(a)(1): "If, in the case of any individual against whom a complaint is filed charging such individual with an offense, no indictment or information is filed within the time limit required by section 3161(b) ..., such charge against that individual contained in such complaint shall be dismissed or otherwise dropped." *Id.* § 3162(a)(1). A § 3162(a)(1) dismissal may be "with or without prejudice" depending upon the seriousness of the offense, the circumstances leading to dismissal, the impact of reprosecution on the Speedy Trial Act and the administration of justice, *id.*, as well as whether the defendant sustained any prejudice, *see United*

*States v. Taylor*, 487 U.S. 326, 332–34, 108 S.Ct. 2413, 101 L.Ed.2d 297 (1988).[3]

▮▮▮ As this court observed in *United States v. Napolitano*, the dismissal remedy provided in § 3162(a)(1)—which is not constitutionally mandated—was the product of legislative compromise and, by its terms, has "very limited application." 761 F.2d at 137 (citing legislative history). The statutory language "requires dismissal only of '*such* charge against the individual contained in *such* complaint.'" *Id.* at 137 (quoting 18 U.S.C. § 3162(a)(1)). *Napolitano* instructs that this language must be read strictly. Thus, it applies only to charges "actually pending against an individual." *United States v. Hillegas*, 578 F.2d at 457. If charges are dismissed before expiration of the thirty-day filing period, there is no bar to their being resurrected in a new complaint or indictment. *See* 18 U.S.C. § 3161(d)(1) (resetting speedy trial clock if, after a complaint charge is dismissed against a defendant, the defendant is recharged with the same offense in a new complaint or indictment). Further, where complaint charges remain pending, courts will not dismiss an untimely indictment pursuant to § 3162(a)(1) if it pleads different charges from those in the complaint, and this applies even if the indictment charges "arise from the same criminal episode as those specified in the original complaint or were known or reasonably should have been known at the time of the complaint." *United States v. Napolitano*, 761 F.2d at 137. Our sister circuits agree and similarly construe the

---

**3.** In *Taylor,* the Supreme Court observed that dismissals with prejudice are not warranted absent a showing of more than "an isolated unwitting violation" of speedy indictment by the prosecutor. *See* 487 U.S. at 339, 108 S.Ct. 2413. Dismissals with prejudice generally require a showing of a "truly neglectful attitude," "bad faith," a "pattern of neglect," or other serious misconduct, *id.* at 338–39,

108 S.Ct. 2413, as well as actual prejudice to the defendant, *id.* at 340–41, 108 S.Ct. 2413; *accord United States v. Wilson,* 11 F.3d 346, 352–53 (2d Cir.1993). The record in this case indicates none of these. Thus, even if dismissal of the challenged indictment counts had been called for under § 3162(a)(1), such dismissal would appropriately have been without prejudice to refiling.

dismissal sanction of § 3162(a)(1) narrowly. *See United States v. Watkins,* 339 F.3d 167, 174 & n. 5 (3d Cir.2003); *United States v. Miller,* 23 F.3d 194, 199 (8th Cir.1994); *United States v. Nabors,* 901 F.2d 1351, 1355 (6th Cir.1990); *United States v. Giwa,* 831 F.2d 538, 541 (5th Cir.1987); *United States v. Heldt,* 745 F.2d 1275, 1280 (9th Cir.1984); *United States v. Brooks,* 670 F.2d 148, 151 (11th Cir.1982).

■■ We exercise such caution in the dismissal of criminal charges mindful that the purpose of the Speedy Trial Act is simply "to expedite the processing of pending criminal proceedings," not to supervise prosecutorial discretion in investigating and charging crimes not actually pending before the court. *United States v. Hillegas,* 578 F.2d at 456. The distinction is of no small import. As *Hillegas* notes, "to invade the latter area might well involve the legislative and judicial branches in matters that fall primarily, if not exclusively, within the jurisdiction of the executive branch." *Id.* at 457. Accordingly, we apply §§ 3161(b) and 3162(a)(1) to pre-indictment delay in pursuing only the specific charges alleged in a pending complaint. As to charges not so specified, a defendant's protections against pre-indictment delay are those provided by the applicable statutes of limitations and the speedy trial safeguards of the Due Process Clause. *See United States v. Lovasco,* 431 U.S. 783, 789–90, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977); *United States v. Hillegas,* 578 F.2d at 457. Thus, the critical question in this appeal is whether the charges pleaded in

Counts One and Six of the indictment are those specifically pleaded in the complaint because, unless they are, the dismissal sanction of § 3162(a)(1) has no applicability.

■■ Gaskin argues that the conspiracies charged in the complaint and in Count One of the indictment are the same because both allege violations of the same statute, 21 U.S.C. § 846, and the time, place, manner, participants, and objectives of the complaint conspiracy are wholly contained within the indictment conspiracy. Further, he insists that "the charge of marijuana possession in both [the] Criminal Complaint and ... Count 6 of the Indictment were brought under the same statute, namely, 21 U.S.C. § 841(a)(1)," and involve identical events and participants relating to the same drug shipment. Gaskin Br. at 14. The government responds that Gaskin was not charged with marijuana *possession* in both the indictment and the complaint. The complaint charges only *attempted* possession. *See* 21 U.S.C. § 846. The government submits that possession and attempted possession are not the same charge because the former offense requires proof of an additional element unnecessary to prove attempt, namely, actual or constructive possession of drugs. Similarly, the government argues that the conspiracy pleaded in Count One is not the same conspiracy charged in the complaint, not only because it is distinguishable under the standard outlined in *United States v. Korfant,* 771 F.2d at 662,[4]

4. In *Korfant,* we identified the following factors as relevant to determining whether two conspiracies are distinct for purposes of the Double Jeopardy Clause: "(1) the criminal offenses charged in successive indictments; (2) the overlap of participants; (3) the overlap of time; (4) similarity of operation; (5) the existence of common overt acts; (6) the geographic scope of the alleged conspiracies or location where overt acts occurred; (7) common objectives; and (8) the degree of interdependence between alleged distinct conspiracies." *United States v. Korfant,* 771 F.2d at 662; *accord United States v. Estrada,* 320 F.3d 173, 180–81 (2d Cir.2003); *see United States v. Gambino,* 968 F.2d 227, 232 (2d Cir.1992). For the reasons discussed *infra* at 454–55, we conclude that double jeopardy analysis is not determinative of the speedy trial issue in this case.

but because it too pleads an additional element, drug quantity, *see* § 841(b)(1)(B)(vii) (prescribing higher penalties for crimes involving 100 kilograms or more of marijuana), not required to prove the complaint conspiracy. *See United States v. Thomas,* 274 F.3d 655, 663 (2d Cir.2001) (en banc) (holding drug quantity that increases statutory maximum sentence to be an element of an offense charged under § 841 that must be pleaded and proved).

■ We agree with the government that when a complaint charge and an indictment charge involve overlapping or even identical facts, dismissal is not warranted under § 3162(a)(1) if the indictment charge requires proof of elements distinct from or in addition to those necessary to prove the crimes pleaded in the complaint. Under such circumstances, the charge in the indictment is simply not " 'such charge' " as was pleaded in " 'such complaint.' " *United States v. Napolitano,* 761 F.2d at 137 (quoting § 3162(a)(1)).

■ The government suggests that this conclusion simply extends traditional double jeopardy analysis to the speedy trial context. That is not precisely correct. Double jeopardy proscribes multiple prosecutions not only for "the same offense" but also "when one offense is a lesser included offense of the other." *Aparicio v. Artuz,* 269 F.3d 78, 96 (2d Cir.2001); *see Brown v. Ohio,* 432 U.S. 161, 168–69, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977) (treating greater and lesser offenses as the "same" for purposes of double jeopardy). To safeguard against both circumstances, the traditional *Blockburger* test calls for a comparison of successive charges to determine whether "each ... requires proof of an additional fact which the other does not." *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932); *accord Aparicio v. Artuz,* 269 F.3d at 97–98 (employing

*Blockburger* analysis to determine whether one offense is a lesser included offense of the other). But the narrow focus of § 3162(a)(1) on "such charge" as was specifically pleaded in a complaint does not call for the equation of greater indictment charges with lesser-included complaint charges. In short, charges that are distinct under double jeopardy analysis will always be distinct for purposes of § 3162(a)(1). But greater and lesser included offenses treated as one for double jeopardy purposes will not qualify as the "same charge" under § 3162(a)(1) when the greater offense is charged after the lesser one.

This case illustrates the distinction we here draw. The drug possession pleaded in Count Six requires proof of a fact not necessary to prove the complaint charge of attempted possession, namely, defendant's actual or constructive possession of marijuana. But the *Blockburger* converse is not true. Attempted drug possession requires proof of no fact unnecessary to possession; rather, possession incorporates all elements of attempted possession. *Compare* 1 L. Sand et al., *Modern Federal Jury Instructions,* at 10–3 (Instruction 10–1) (2003) (charging attempt) *with* 3 *id.* at 56–4, 56–19 (Instructions 56–2 and 56–4) (charging drug possession). In sum, attempted drug possession in violation of 21 U.S.C. § 846 is simply a lesser-included offense of the drug possession proscribed by § 841(a)(1). *See* Fed.R.Crim.P. 31(c) (including attempt with lesser-included offenses of which a defendant may be found guilty without a separate charge); *United States v. Marin,* 513 F.2d 974, 976 (2d Cir.1975) (holding that defendant charged with possession of cocaine may be found guilty of attempted possession, even though the latter crime was not specifically charged); *see also Costo v. United States,* 904 F.2d 344, 348 (6th Cir.1990) (holding attempted drug distribution to be a lesser-

**454**

included offense of actual distribution); *United States v. Remigio*, 767 F.2d 730, 733 (10th Cir.1985) (holding attempted manufacture of methamphetamines to be lesser-included offense of actual manufacture).[5]

 Similarly with respect to the challenged conspiracy charges, to survive a double jeopardy attack, the government would have to show that the two schemes involved "distinct" agreements. *United States v. Lopez*, 356 F.3d 463, 467 (2d Cir.2004) ("[T]he relevant double jeopardy inquiry is 'simply whether the second prosecution is for a conspiracy distinct from that previously prosecuted.'" (quoting *United States v. Gambino*, 968 F.2d 227, 231 (2d Cir.1992))). That does not appear to be this case. The two conspiracies shared a common overall objective: procurement of large quantities of marijuana to supply Gaskin's Rochester drug operation. Moreover, although the indictment conspiracy pursued this objective over a longer period of time and involved more participants, overt acts, geographic areas, and means of transportation than the complaint conspiracy, the relationship of the two schemes appears to have been that of concentric rather than overlapping circles. *See Aparicio v. Artuz*, 269 F.3d at 97 (noting that offenses are the "same" for purposes of double jeopardy if their relationship is "'like that of concentric circles rather than overlapping circles'" (quoting 4 Wayne R. LaFave et al., *Criminal Pro-*

*cedure* § 17.4(b) (2d ed.1999))). While *Korfant* analysis is helpful to determining what constitutes a distinct agreement in the case of "overlapping" conspiracies, it may be unnecessary where the lesser conspiracy is plainly encompassed within the larger. As Judge Newman has observed, where a smaller conspiracy is "wholly contained" within a larger one, they are "normally, perhaps always," treated as the same offense for jeopardy purposes. *United States v. Macchia*, 35 F.3d 662, 672 (2d Cir.1994) (Newman, C.J., concurring). Indeed, in *United States v. Lopez*, 356 F.3d at 469, we recently vacated on double jeopardy grounds a conviction on an expansive second conspiracy that necessarily encompassed a narrower scheme for which defendant had already been convicted, concluding that, in such circumstances, no further analysis of *Korfant* factors was necessary.

The fact that the complaint charges against Gaskin thus appear to be lesser-included offenses to the charges in Counts One and Six of the indictment does not, however, resolve this appeal. The issue before us is not constitutional double jeopardy but statutory speedy trial. The reason double jeopardy equates greater and lesser included offenses, even though the former require proof of additional elements, is to ensure against prosecutorial abuse in pursuing multiple punishments through successive prosecutions. As the Supreme Court explained in *Brown v.*

---

**5.** Although Title 21 places attempted possession and possession in separate statutory sections, *see* 21 U.S.C. §§ 841(a), 846; *see also id.* §§ 960(a)(1), 963 (prohibiting importation and attempted importation of controlled substances), that fact is of little import to our analysis. Many federal laws proscribe both specific criminal conduct and attempts to engage in such conduct in the same statutory section. *E.g.*, 18 U.S.C. § 351 (prohibiting assassination or kidnapping of certain federal officials and attempts to commit same); *id.*

§ 594 (prohibiting intimidation and attempted intimidation of voters); *id.* § 844 (prohibiting transportation and attempted transportation of explosives in interstate commerce); *id.* § 1029 (prohibiting fraudulent use and attempted fraudulent use of counterfeit access devices); *id.* § 1201 (prohibiting interstate kidnapping and attempted kidnapping). To the extent the greater offense requires proof of additional elements to the lesser-included attempt, the charges are distinct for purposes of the § 3162(a)(1) speedy trial sanction.

*Ohio,* if "the judge is forbidden to impose cumulative punishment for two crimes at the end of a single proceeding, the prosecutor is forbidden to strive for the same result in successive proceedings." 432 U.S. at 166, 97 S.Ct. 2221. Gaskin, however, has never been at risk of successive prosecutions or multiple punishments for the greater and lesser offenses charged in this case. He invokes § 3162(a)(1) to avoid *any* prosecution on these charges. The Speedy Trial Act does not dictate such broad immunity.[6] Its concern is that charges actually pending against a defendant be promptly processed. *See United States v. Hillegas,* 578 F.2d at 456 n. 3 (citing legislative history).

When the government files a complaint against a defendant, what it does, in essence, is publicly pronounce that it has probable cause to believe that he has committed certain charged crimes. Sections 3161(b) and 3162(a)(1) give the government thirty days to make good on its representation by securing an indictment on "such charge[s]" or risk their dismissal. But a complaint charging a lesser offense does not publicly accuse the defendant of any greater crime. Nor does it represent that the government has probable cause to support the additional elements of any greater offense. Until there is such a formal public accusation, there is no Speedy Trial Act interest in compelling the government to seek indictment on uncharged greater offenses within thirty days of charging lesser-included ones. Indeed, justice is usually best served by discouraging hasty prosecutorial judgments with respect to aggravated charges. Thus,

neither the language of the statute nor its purpose require § 3162(a)(1)'s dismissal sanction to reach beyond the original lesser offenses charged in a complaint to greater offenses requiring proof of additional elements that are charged for the first time in a subsequent indictment. In this respect, we do not apply double jeopardy analysis to interpretation of the term "such charge" in § 3162(a)(1).

The Fifth Circuit reached essentially the same conclusion in *United States v. Bailey,* 111 F.3d 1229 (5th Cir.1997), a case in which a defendant initially charged with misdemeanor possession of a stolen firearm moved to dismiss an untimely indictment charging him with felony possession of the same weapon. The court denied § 3162(a)(1) relief, holding that the additional element required to prove the felony, namely, that the stolen property had a value of $100 or more, meant the indictment and complaint charges were not the same. *Id.* at 1237. In so holding, the court alluded to the *Blockburger* test, but in *Bailey,* as here, it was only the indictment charge that contained an additional element; the complaint charge was a lesser-included offense. Thus, the court appears, in fact, to have applied a test akin to the one we here adopt, holding § 3162(a)(1) inapplicable to indictment charges requiring proof of elements additional to those necessary to establish lesser-included complaint charges.

Gaskin, however, urges us to focus on language in *Napolitano* that acknowledged—without adopting—holdings in other circuits suggesting that § 3162(a)(1)

---

**6.** Indeed, even double jeopardy does not erect an absolute bar to "successive prosecution on a greater offense ... where justified by the public interest in law enforcement and the absence of prosecutorial overreaching." *Garrett v. United States,* 471 U.S. 773, 796–97, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985) (O'Connor, J., concurring) (joining in decision rejecting double jeopardy challenge to a continuing criminal enterprise prosecution pursued after defendant's earlier prosecution for lesser-included predicate and citing other cases where prior prosecution on lesser offense did not bar prosecution on greater offense).

"may" require the dismissal of "an indictment which merely 'gilds' an earlier charge." 761 F.2d at 138. The existence and contours of a gilding doctrine to expand the scope of § 3162(a)(1) beyond the express charges specifically pleaded in a complaint has generally been viewed with skepticism. *See United States v. Watkins,* 339 F.3d at 176–78 (surveying case law addressing gilding doctrine). We need not here decide whether there are any circumstances where we might apply the concept of gilding to a Speedy Trial Act challenge. We hold simply that pleadings that add elements to the government's burden of proof beyond those required for the lesser included charges in a complaint do more than gild the original charges. *See generally United States v. Oliver,* 683 F.Supp. 35, 38 (E.D.N.Y.1988) (noting dictionary definition of "gilding" as "unnecessary ornamentation"), *quoted in United States v. Watkins,* 339 F.3d at 176, *and in United States v. Bailey,* 111 F.3d at 1236. They replace them with different charges that are not subject to dismissal under § 3162(a)(1) when no timely indictment has been filed on the lesser-included complaint charges.

In sum, § 3162(a)(1) did not require dismissal of Counts One and Six of the indictment.

**B.** *Motion to Suppress Evidence*

■ Prior to trial, Gaskin moved to suppress cash and records seized by federal agents on June 17, 1999, as the result of two warrantless searches of his Honda Accord. The first search was conducted in the Carvel parking lot shortly after Gaskin's arrest and resulted in the discovery of $16,000. The second search, conducted at FBI offices when the car was inventoried, resulted in the discovery of papers linking Gaskin to various co-conspirators. After an evidentiary hearing, the district court upheld the searches pursuant to the automobile and forfeiture exceptions to the Fourth Amendment warrant requirement. Reviewing the district court's factual findings for clear error and its legal conclusions *de novo, see, e.g., United States v. Yousef,* 327 F.3d 56, 124 (2d Cir.2003), we conclude that Gaskin's suppression motion was properly denied.

1. *The "Automobile Exception"*

■ Under the "automobile exception" to the Fourth Amendment warrant requirement, police may conduct a warrantless search of a readily mobile motor vehicle if probable cause exists to believe the vehicle contains contraband or other evidence of a crime. *See Pennsylvania v. Labron,* 518 U.S. 938, 940, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996)(per curiam); *Carroll v. United States,* 267 U.S. 132, 151–62, 45 S.Ct. 280, 69 L.Ed. 543 (1925); *see also California v. Acevedo,* 500 U.S. 565, 569–70, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991). The mobility prong of the exception is undisputed in this case; Gaskin challenges only the existence of probable cause.

■ As the Supreme Court has repeatedly explained, "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts." *Illinois v. Gates,* 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Its focus is on "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). Thus, probable cause exists "where 'the facts and circumstances within ... [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' " evidence of a crime will be found in the place to be searched. *Id.* at 175–76, 69 S.Ct. 1302 (quoting *Carroll v. United States,* 267 U.S. at 162, 45 S.Ct.

280) (alterations in original); *accord United States v. Patrick,* 899 F.2d 169, 171 (2d Cir.1990). The standard does not demand certainty but only a "fair probability" that contraband or evidence of a crime will be found. *Illinois v. Gates,* 462 U.S. at 238, 103 S.Ct. 2317; *accord United States v. Harwood,* 998 F.2d 91, 96 (2d Cir.1993). Further, courts recognize that experience and training may allow a law enforcement officer to discern probable cause from facts and circumstances where a layman might not. *See United States v. Price,* 599 F.2d 494, 501 (2d Cir.1979) (holding that circumstances must be viewed "through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training" (internal quotation marks omitted)); *see also* 2 Wayne R. LaFave, *Search and Seizure* § 3.2(c), at 39 (3d ed. 1996) ("[A] trained and experienced officer will have probable cause in circumstances when the layman would not."); *cf. United States v. Colon,* 250 F.3d 130, 136–37 (2d Cir.2001) (concluding that facts that might have supported an investigative stop if known by a law enforcement officer could not support stop when known only to a civilian 911 operator).

█ Before the first search of Gaskin's car, FBI agents knew: (1) Gaskin's purpose in driving to the Carvel parking lot on June 17, 1999, was not innocent; he was there to take delivery of approximately eighty-six pounds of marijuana; (2) Gaskin was no novice to marijuana dealing—indeed, he had sold marijuana to Shaw for some months; (3) Gaskin had personally financed and organized the marijuana transportation from Arizona; (4) Gaskin had already paid Shaw several thousand dollars in fees and expenses and was to pay the remainder of his fee and expenses at the parking lot meeting; (5) Gaskin had $3,895 on his person at the time of arrest; (6) Gaskin had used three different cell phones to communicate with Shaw while the courier was en route to New York with the marijuana, and had one cell phone on his person at the time of arrest; (7) Shaw had told authorities Gaskin frequently carried firearms; (8) police records indicated that Gaskin had a pistol permit listing four firearms; and (9) Gaskin had no firearm on his person when arrested. In addition, the FBI agent who searched Gaskin's car testified that he knew from experience what this court has frequently observed: (10) guns are tools of the narcotics trade, frequently carried by dealers, particularly when they engage in transactions involving drugs or money. *See, e.g., United States v. Reyes,* 353 F.3d 148, 154 (2d Cir.2003) (recognizing that firearms are regularly found on narcotics traffickers); *United States v. Crespo,* 834 F.2d 267, 271 (2d Cir.1987) ("[T]o substantial dealers in narcotics, firearms are as much tools of the trade as are the commonly recognized articles of narcotics paraphernalia."). The totality of these circumstances established probable cause to believe that guns, cell phones, and money linked to Gaskin's drug dealing would likely be found in his car.

Specifically, Shaw's disclosure that Gaskin frequently carried a gun during drug deals, together with public information corroborating Gaskin's ownership of multiple firearms, when viewed through the prism of agent experience, gave rise to a strong probability that Gaskin would have brought one or more guns to the delivery site. Having found no gun on Gaskin's person, the agents could have reasonably concluded that firearms were probably in his car.

Agents did find a cell phone on Gaskin's person, but they knew from Shaw that Gaskin had used three different cell phones in recent days to communicate about the marijuana transfer. Because cell phones are often kept and used in cars, there was probable cause to believe

that Gaskin's other cell phones would likely be found in his car.

Similarly, although agents seized $3,895 from Gaskin, an amount that might well have sufficed to meet his immediate obligations to Shaw, the agents knew that Gaskin ran a major drug distribution organization and that he routinely expended large sums of cash to meet expenses associated with his criminal activities. Gaskin undoubtedly faced additional costs in connection with the storage, packaging, and distribution of the recently arrived marijuana. Thus, there was a reasonable probability that Gaskin had even more cash in his car to cover these costs.

In sum, because the agents had probable cause to believe that the Honda Accord contained incriminating evidence against Gaskin in the form of guns, cell phones, and cash, their warrantless search of the vehicle was permissible under the automobile exception, and the district court properly refused to suppress the evidence seized.

### 2. The "Forfeiture Exception"

■ Citing *United States v. Zaicek,* 519 F.2d 412 (2d Cir.1975), and *Florida v. White,* 526 U.S. 559, 119 S.Ct. 1555, 143 L.Ed.2d 748 (1999), the district court further upheld the warrantless search of Gaskin's automobile on the ground that probable cause supported the vehicle's forfeiture pursuant to 21 U.S.C. § 881(a). We agree.

■ In *Zaicek,* this court held that when a "car is properly seized by the police pursuant to a forfeiture statute," the government has "a greater possessory interest in the car than the owner," permitting law enforcement officers to search the seized vehicle without a warrant. 519 F.2d at 414. Thereafter, in *United States v. Lasanta,* 978 F.2d 1300, 1306 (2d Cir. 1992), we indicated that a warrant was necessary to effect a proper civil forfeiture seizure, but in *Florida v. White,* 526 U.S.

at 561, 119 S.Ct. 1555, the Supreme Court specifically rejected *Lasanta,* at least as it pertains to motor vehicles seized in public places. The Court ruled that law enforcement officers may seize forfeitable vehicles from public places without a warrant if they have probable cause to believe that the vehicle is, in fact, subject to forfeiture. *See id.* Thus, as the district court correctly observed, *Florida v. White* and *Zaicek,* read together, establish that law enforcement officers who have probable cause to believe an automobile is subject to forfeiture may both seize the vehicle from a public place and search it without a warrant.

Gaskin submits that warrantless forfeiture searches should be limited to car seizures based on probable cause to believe the vehicle was used to transport or conceal drugs, not cases, such as this one, where the vehicle was used only to transport a drug dealer to a drug transaction. He offers no legal or logical support for drawing the distinction urged, and we find none in the relevant statutes and case law.

Certainly *Zaicek* does not support Gaskin's argument. There, the court acknowledged as "well settled" that a vehicle seized "on the grounds that it was used to transport contraband" could be searched without a warrant. 519 F.2d at 414. But *Zaicek* expressly declined to limit warrantless searches to such circumstances. Indeed, the car at issue in *Zaicek* was seized not because it had transported contraband, but because it had been reported stolen. *See id.* (citing N.Y. Veh. & Traf. Law § 424(3) (McKinney 1970) (permitting police to seize stolen motor vehicles)). This court ruled that once property is properly seized "by the police pursuant to a statute, such stolen or forfeitable property can be searched by them without a warrant." *Id.* at 415.

Section 881(a) and (b) of Title 21 provides the statutory authority for the seizure of Gaskin's car.[7] Subsection (b) authorizes the warrantless seizure "incident to an arrest" of "[a]ny property subject to civil forfeiture." 21 U.S.C. § 881(b) (1999). Subsection (a) defines the property subject to civil forfeiture:

> The following shall be subject to forfeiture to the United States and no property right shall exist in them: ... All ... vehicles, ... which are used, or are intended for use, to transport, or in any manner to facilitate the transportation, sale, receipt, possession, or concealment of [a controlled substance].

*Id.* § 881(a).

Construing subsection (a) in *United States v. One 1974 Cadillac Eldorado Sedan,* 548 F.2d 421, 426 (2d Cir.1977), this court specifically refused to limit its reach to vehicles used to transport or conceal drugs. We ruled that the statute contemplates "forfeiture if the vehicle in any manner facilitates the sale of a controlled drug." *Id.* at 427. The Cadillac at issue in that case had been used by two drug dealers to drive from a location in the Bronx to an apartment building in Manhattan where they met a prospective buyer and discussed a cocaine sale that took place sometime thereafter. Ruling that "conveyance of [the drug traffickers] in the Cadillac to and from the June 7 meeting did facilitate the sale of the drug," this court ordered the car forfeited to the United States. *Id.*

Gaskin's use of his automobile on June 17, 1999, was certainly as important to the facilitation of his drug dealing as the vehicle use detailed in *One 1974 Cadillac Eldorado Sedan.* Gaskin drove to a meeting with a drug courier not simply to negotiate future transports of marijuana but to take delivery of a load of marijuana concealed in a motor home. That the agents had probable cause to believe that this was Gaskin's purpose and to arrest him for drug trafficking is indisputable. Thus, pursuant to § 881(a) and (b), agents were lawfully entitled to seize the car that he had used to facilitate this transaction and, thereafter, to search it.

Accordingly, we affirm the district court's decision denying Gaskin's motion to suppress incriminating evidence found in the course of these searches.

### C. Sufficiency of the Evidence

Both defendants challenge the sufficiency of the evidence supporting their conviction: Gaskin submits that the evidence failed to prove that he ever actually or constructively possessed marijuana, while Castle asserts that the prosecution failed to prove his knowing participation in the charged crimes. Gaskin further challenges the sufficiency of the evidence supporting the court's forfeiture order. These arguments are uniformly without merit.

#### 1. Challenges to Convictions

As we have repeatedly observed, a defendant raising an appellate challenge to the sufficiency of the evidence supporting a conviction faces a "heavy burden," because we must review the evidence in the light most favorable to the government, drawing all reasonable inferences in its favor. *E.g., United States v. Henry,* 325 F.3d 93, 103 (2d Cir.2003); *United States v. Glenn,* 312 F.3d 58, 63 (2d Cir. 2002). Reversal is warranted only if no rational factfinder could have found the crimes charged proved beyond a reason-

---

7. Effective August 23, 2000, the federal civil forfeiture statutes were amended by the Civil Asset Forfeiture Reform Act of 2000, Pub.L. No. 106–185, 114 Stat. 202 (2000) ("CAF- RA"). In this opinion, we refer to the relevant statutory sections in effect at the time of Gaskin's June 1999 arrest.

able doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *accord United States v. Henry*, 325 F.3d at 103.

### a. *Gaskin's Possession of Marijuana*

■ Judged by this standard, Gaskin's claim that the evidence was insufficient to prove his possession of marijuana borders on the frivolous. Gaskin was arrested while taking possession of an eighty-six-pound load of marijuana. Nevertheless, he insists that the evidence was insufficient to prove that the substance seized was in fact marijuana because the drug exhibits in the case were received in evidence without the proper foundation of a chemical analysis. The parties, however, stipulated to the testimony of a forensic chemist that she had personally tested the drug exhibits and found all to contain marijuana. Pursuant to Rule 705 of the Federal Rules of Evidence, the jury was entitled to credit this stipulation of opinion without further testimony regarding the particular analyses supporting the chemist's conclusions. *See* Fed.R.Evid. 705 (permitting expert to "testify in terms of opinion ... without first testifying to the underlying facts or data, unless the court requires otherwise"); *Ambrosini v. Labarraque*, 966 F.2d 1464, 1468–69 (D.C.Cir. 1992).[8]

■ In any event, neither actual drug exhibits nor reports of chemical analysis are required to support a conviction for possession of a controlled substance. *See United States v. Bryce*, 208 F.3d 346, 353–54 (2d Cir.1999). As we noted in *Bryce*, " '[l]ay testimony and circumstantial evidence may be sufficient, without the introduction of an expert chemical analysis, to establish the identity of the substance involved in an alleged narcotics transaction.' " *Id.* (quoting *United States v. Dolan*, 544 F.2d 1219, 1221 (4th Cir.1976)). A reasonable jury could have concluded from the testimony of accomplice witnesses Gahr and Shaw, as well as from the extensive circumstantial evidence linking Gaskin to the marijuana seized from these couriers, that, at various times, Gaskin had been in actual or constructive possession of the marijuana charged in Counts Two and Six. Although Gaskin vigorously argues that the courier witnesses were not reliable, we must assume that the jury resolved all credibility disputes in favor of the prosecution. *See United States v. Desena*, 287 F.3d 170, 177 (2d Cir.2002); *United States v. Anglin*, 169 F.3d 154, 159 (2d Cir.1999).

### b. *Castle's Knowing Participation in the Charged Crimes*

■ Castle's sufficiency challenge is equally meritless. The totality of the trial evidence clearly established the existence of a large-scale conspiracy to transport marijuana from the western United States to Rochester, New York. Once the prosecution proves a charged conspiracy, the evidence necessary to link a particular defendant to the scheme need not be overwhelming and may be circumstantial in nature. *See, e.g., United States v. Desena*,

---

8. Where a party questions whether sound scientific methodology provides a basis for an expert opinion, it may move to preclude the admission of the opinion. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Gaskin made no such motion; instead, he stipulated to the admissibility of the expert opinion. Under such circumstances, he cannot complain on appeal that the opinion lacks foundation. *See Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1066–67 (9th Cir.1996) (declining to entertain a *Daubert* challenge on appeal presented "in the guise of an insufficiency-of-the-evidence argument"); *see also C.B. Fleet Co. v. Smith-Kline Beecham Consumer Healthcare, L.P.*, 131 F.3d 430, 437 (4th Cir.1997) (same).

260 F.3d 150, 154 (2d Cir.2001) (and cases cited therein). Indeed, the element of knowledge, whether in connection with a conspiracy or substantive charge, often can be proved only by circumstantial evidence. *See United States v. Hastings,* 918 F.2d 369, 373 (2d Cir.1990) (holding that knowledge may be established by circumstantial evidence); *see also United States v. Gordon,* 987 F.2d 902, 906–07 (2d Cir.1993) ("[A] defendant's knowledge of the conspiracy and his participation in it with criminal intent may be established through circumstantial evidence.").

In this case, Gahr identified Castle as the person who accompanied Gaskin on the road trip to California preliminary to the Illinois marijuana transport. The circumstances of the trip—two vehicles driving cross-country, in tandem, round the clock, with Gaskin carrying $150,000 in cash—make Castle's "mere presence" on the journey highly unlikely. *See United States v. Gordils,* 982 F.2d 64, 71–72 (2d Cir.1992) (holding that defendant's knowing participation in conspiracy could be inferred from circumstances indicating organization would not have compromised its security by giving access to an outsider); *United States v. Padilla,* 961 F.2d 322, 325 (2d Cir.1992) (holding that defendant's knowing participation in crime could be inferred from evidence that confederates would not otherwise have included him in meeting with drug courier "lest he find out the truth and interfere"). In any event, Gahr described Castle as an active participant in the San Diego meeting where all four conspirators discussed whether to continue with their transport scheme in light of the Kansas vehicle stops. Gahr testified that when it was agreed to go forward using a different vehicle, Castle was the conspirator who actually rented the Buick sedan in which the drugs were concealed, an act in furtherance of the charged scheme that was corroborated by rental and credit card records. Further, after the marijuana was seized from this Buick in Illinois, telephone records revealed that Gaskin repeatedly reached out for Castle. Assuming, as we must, that the jury credited Gahr's account, *see United States v. Desena,* 287 F.3d at 177; *United States v. Anglin,* 169 F.3d at 159, this evidence amply supported Castle's conviction.

### 2. *Challenge to Forfeiture*

█ Count Eight of the indictment sought forfeiture of any property that Gaskin had "used and intended to … use[ ]," to facilitate the drug crimes charged in Count One and Count Six, specifically the $3,895 seized from his person and the $16,000 seized from his car at the time of his arrest. Indictment 00 CR 6148, at Count 8. Having heard the trial evidence, the district court found that Gaskin had so used the seized monies and ordered forfeiture.[9] Gaskin challenges this ruling on two grounds: (1) the prosecution failed to carry its burden pursuant to 21 U.S.C. § 853(d)(2) to demonstrate "no likely source" for the seized monies other than drug trafficking; and (2) the district court's decision was informed by unreliable evidence, a canine alert to drugs on the $16,000.

█ Because criminal forfeiture is viewed as part of the sentencing process, *see Libretti v. United States,* 516 U.S. 29, 38–41, 116 S.Ct. 356, 133 L.Ed.2d 271 (1995), the government need prove facts supporting forfeiture only by a preponderance of the evidence, *see United States v. Bellomo,* 176 F.3d 580, 595 (2d Cir.1999).

---

**9.** Reviewing the district court's oral ruling, we are satisfied that its finding that Gaskin impermissibly "used" the monies was intended to encompass both proscribed use and intended use.

We review the district court's factual findings for clear error and its legal conclusions *de novo.* *See In re Seizure of All Funds in Accounts in the Names Registry Publ'g, Inc.,* 68 F.3d 577, 580 (2d Cir.1995).

Pursuant to 21 U.S.C. § 853(a), the government may seek a defendant's forfeiture of the following:

(1) any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of [the violation of conviction];

(2) any of the person's property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation; and

(3) in the case of a person convicted of engaging in a continuing criminal enterprise ..., in addition ... any of his interest in, claims against, and property or contractual rights affording a source of control over, the continuing criminal enterprise.

21 U.S.C. § 853(a). Subsection (d) of the statute affords the government a rebuttable presumption of forfeiture as to any property acquired by a defendant "during the period" of his criminal offense or soon thereafter. *Id.* § 853(d). For the presumption to apply, however, the government must demonstrate "no likely source for such property other than the violation of this subchapter." *Id.* § 853(d)(2).

Section 853(d)(2) is not applicable to Gaskin's case. By its terms, it applies only when forfeiture is sought pursuant to § 853(d)'s statutory presumption as to the property's criminal origins. In this case, the government did not invoke that presumption; it sought forfeiture pursuant to § 853(a)(2). Because a preponderance of the evidence supports the conclusion that Gaskin had used or intended to use the seized money to facilitate his drug trafficking, forfeiture was appropriate under § 853(a)(2) without regard to the "likely source" of the property. *See generally* *United States v. Garcia–Guizar,* 160 F.3d 511, 518 (9th Cir.1998) (discussing various sections of § 853).

Gaskin, after all, had brought almost $20,000 in cash with him to a site where he expected to take delivery of a large quantity of marijuana. Gaskin's intent to use the money to facilitate this drug transfer was established, in part, by direct evidence: his own statement to Shaw that he had with him the money necessary to pay the remainder of Shaw's fee, $1,000, and to reimburse him for certain travel expenses. Moreover, the trial evidence showed that Gaskin, in his role as organizer and leader of the charged conspiracy, *see infra* at Part II.F.4, routinely carried and spent large sums of cash to meet myriad expenses associated with his drug operation. Thus, a fair inference could be drawn that Gaskin intended to use the cash at issue to pay Shaw *and* to cover such other expenses as would arise in connection with the distribution of the delivered drug load. Indeed, such an inference of guilty intent with respect to use of the seized money was strengthened by Gaskin's post-arrest false exculpatory statement denying ownership or knowledge of the $16,000. *See United States v. Glenn,* 312 F.3d 58, 69 (2d Cir.2002) (holding that false exculpatory statements do not alone prove guilt but may constitute "circumstantial evidence of consciousness of guilt and may strengthen inferences supplied by other pieces of evidence").

Further, such an inference was supported by the canine alert, which suggested that the $16,000 had already been used in some way connected to Gaskin's drug operation. Gaskin challenges the reliability of canine alerts. This court, however, has ruled that a reliability challenge to such evidence does not preclude its consideration so long as other evidence supports the factfinder's conclusion. *See United*

*States v. Marji,* 158 F.3d 60, 63 (2d Cir. 1998) (rejecting trial challenge to canine alert evidence).

Because ample direct and circumstantial evidence supported a finding that Gaskin had used and intended to use the seized money to facilitate his charged drug trafficking, we conclude that it was properly ordered forfeited.

### D. *Missing Witness Charge*

 Gaskin maintains that the district court erred in denying his request for a missing witness charge based on the government's failure to call Ron Ruffin as a prosecution witness. A missing witness charge invites the jury to draw an adverse inference against a party that fails to call a witness whose " 'production ... is peculiarly within [its] power.' " *United States v. Mittelstaedt,* 31 F.3d 1208, 1216 (2d Cir.1994) (quoting *United States v. Nichols,* 912 F.2d 598, 601 (2d Cir.1990)). Because we recognize that an "aura of gamesmanship" frequently accompanies requests for missing witness charges, *id.* at 1215 (internal quotation marks omitted), we afford district judges considerable discretion in deciding when they should and should not be given, *see United States v. Torres,* 845 F.2d 1165, 1170–71 (2d Cir. 1988). We are particularly disinclined to second-guess their decisions where, as in this case, " 'a judge refrains from commenting on the inference to be drawn on the facts before the jury and allows counsel instead to argue the inference.' " *United States v. Mittelstaedt,* 31 F.3d at 1215 (quoting *United States v. Saa,* 859 F.2d 1067, 1076 (2d Cir.1988)). We will reverse only upon a showing of both abuse of discretion, *see United States v. Nichols,* 912 F.2d at 601, and actual prejudice, *see United States v. Mittelstaedt,* 31 F.3d at 1215. Gaskin can show neither.

 Gaskin submits that Ruffin was unavailable to the defense because federal authorities had relocated him to an undisclosed location. The "availability" of a witness to a particular party does not depend on knowledge of the witness's whereabouts but on the totality of circumstances "bearing upon the witness's relation to the parties." *United States v. Myerson,* 18 F.3d 153, 158 (2d Cir.1994). As the district court correctly observed, although Gaskin may not have known Ruffin's physical location, he did know that Ruffin was represented by counsel. Gaskin's attorney, however, made no effort to contact the witness through this lawyer. This is not surprising. Early in the trial, both defense attorneys had expressly stated on the record that they had no intention of calling Ruffin as a trial witness. Under these circumstances, the district court did not abuse its discretion in denying defendants a missing witness charge, nor was Gaskin prejudiced by this ruling. *See United States v. Mittelstaedt,* 31 F.3d at 1215–16.

### E. *Request for a Mistrial Based on Jury Misconduct*

 Both defendants submit that jury misconduct required the declaration of a mistrial. We review a trial judge's handling of alleged jury misconduct for abuse of discretion, mindful that a mistrial is warranted only upon a showing of actual prejudice. *See United States v. Abrams,* 137 F.3d 704, 708–09 (2d Cir.1998) (per curiam).

 In this case, the concern about jury misconduct arose when a court officer informed the trial judge that fewer than twelve jurors might have discussed the case during a break in deliberations. The judge promptly questioned the foreperson and ascertained that the discussion in question lasted approximately five minutes and was limited to jurors' expressions of surprise upon noticing that the verdict

form included lesser-included offense alternatives for Counts Three and Four.

Preliminarily, we observe that defendants were acquitted on Counts Three and Four in all respects. Thus, defendants cannot claim that they were prejudiced as to these charges by the challenged juror discussion. Further, because the foreperson, when questioned by the court, unequivocally stated that there had never been any consideration of evidence or culpability except with all jurors present, the trial court acted well within its discretion in concluding that there was no need to declare a mistrial.

### F. Gaskin's Sentencing Challenges

██ Gaskin submits that the evidence failed to support the district court's application of four Sentencing Guidelines enhancements. Although we review a district court's legal application of the Guidelines *de novo, see United States v. Genao,* 343 F.3d 578, 583 (2d Cir.2003), we review its factual findings deferentially for clear error, *see* 18 U.S.C. § 3742(e), bearing in mind that the standard of proof at sentencing is a preponderance of the evidence, *see United States v. Thorn,* 317 F.3d 107, 117 (2d Cir.2003).

When making sentencing determinations, a district court may rely on any facts available to it, including information contained in the Pre–Sentence Report. *See United States v. Shepardson,* 196 F.3d 306, 309 (2d Cir.1999); *United States v. Sisti,* 91 F.3d 305, 312 (2d Cir.1996). Further, a sentencing court, like a jury, may base its factfinding on circumstantial evidence and on reasonable inferences drawn therefrom. Indeed, this will often have to be the case when the issue in dispute is a defendant's knowledge and intent. *See United States v. Khedr,* 343 F.3d 96, 102 (2d Cir.2003); *United States v. Sisti,* 91 F.3d at 313.

#### 1. *Use of a Minor*

██ When Gaskin arrived at the Carvel parking lot in his Honda Accord on June 17, 1999, he was accompanied by his seventeen-year-old son. Having heard extensive testimony about this parking lot meeting both at a suppression hearing and at trial, the district court, at sentencing, reached what it characterized as an "inescapable" conclusion: Gaskin had deliberately brought his son to the meeting so that the boy could drive Gaskin's car away from the parking lot while Gaskin drove the motor home. Accordingly, the court imposed a two-level sentencing enhancement pursuant to U.S.S.G. § 3B1.4.

Guideline § 3B1.4 provides that "[i]f the defendant used or attempted to use a person less than eighteen years of age to commit the offense or assist in avoiding detection of, or apprehension for, the offense, increase by 2 levels." U.S.S.G. § 3B1.4. The application notes broadly define "[u]sed or attempted to use" to include "directing, commanding, encouraging, intimidating, counseling, training, procuring, recruiting, or soliciting." *Id.* Application Note 1; *see Stinson v. United States,* 508 U.S. 36, 38, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993) ("[C]ommentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline.").

██ As this language makes plain, the appropriate focus of a court's inquiry is on the actions and intent of the defendant. Whether the minor himself engaged in any criminal actions, whether the minor intended to assist in the adult's criminal activity, or whether the minor even knew that the adult was involved in criminal activity are factors irrelevant to application of the § 3B1.4 enhancement. Recent decisions by our sister circuits share this

view. *See United States v. Tran,* 285 F.3d 934, 937–38 & n. 2 (10th Cir.2002) (upholding § 3B1.4 enhancement for using a minor as an unwitting driver during criminal activity); *United States v. Anderson,* 259 F.3d 853, 863–64 (7th Cir.2001) (upholding § 3B1.4 enhancement for directing minor bank tellers under defendant's supervision to make withdrawals that tellers did not know were unauthorized); *see also United States v. Castro-Hernandez,* 258 F.3d 1057, 1059–61 (9th Cir.2001) (upholding enhancement where father used three-year-old son as decoy during drug smuggling trip to avoid detection); *United States v. Warner,* 204 F.3d 799, 800–01 (8th Cir. 2000) (upholding enhancement where defendant offered to leave eight-year-old daughter with drug purchasers as collateral for the payment money they entrusted to him). Thus, regardless of what Gaskin's son knew or intended with respect to his father's drug trafficking activities on June 17, 1999, if the evidence supported a conclusion that Gaskin brought the boy to the parking lot to help in any manner with his drug transfer plans, the district court properly applied a § 3B1.4 enhancement.

Trial evidence indicated that Gaskin had come to the meeting with Shaw pursuant to a specific appointment made earlier that day. This fairly supported an inference that the boy's presence at the meeting site was not coincidental but the product of a conscious choice by Gaskin. Further, the evidence showed that the single purpose of the Gaskin/Shaw meeting was to transfer possession of a motor home containing marijuana. Because Gaskin was arrested as he attempted to drive this motor home from the meeting site, it was obvious that he needed the assistance of some other person to drive his own car from the scene. Shaw's testimony indicated that it was never contemplated that he would drive Gaskin's car from the location. Thus, the logical conclusion to draw from the fact that Gaskin had brought his son to the meeting and left the boy in the Honda when he got in the motor home was that Gaskin intended his son to drive the car.

Because the district court did not clearly err in finding such intended use of a minor, it properly applied the § 3B1.4 enhancement to Gaskin's guideline calculations.

### 2. *Obstruction of Justice*

Guideline § 3C1.1 provides a two-level enhancement "[i]f (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct." U.S.S.G. § 3C1.1. The application notes to this guideline identify among the types of conduct deemed obstructive, "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so." *Id.* Application Note 4(a).

Bonnie Gahr testified that, sometime after June 17, 1999, Gaskin told her that he planned to kill the drug courier—Theodore Shaw—whose cooperation had led to his arrest. The district court concluded that Gaskin made this statement to Gahr, a potential witness who could provide even more incriminating evidence against him than Shaw, to intimidate her into not cooperating with authorities in their pending investigation of his drug trafficking. A threat to a potential witness qualifies as an attempt to obstruct justice and fully warrants a sentencing enhancement pursuant to § 3C1.1. *See United States v. Sanchez,* 35 F.3d 673, 680 (2d Cir.1994). Nevertheless, Gaskin submits that the evidence was insufficient to support a finding that his intent in threaten-

ing Shaw's life was to intimidate Gahr. Gaskin submits that the evidence shows only that he was "blowing off steam." Gaskin's Br. at 19.

Gaskin's argument casts his words and conduct in the light most favorable to him, a view the district court was not required to adopt. *United States v. Greer*, 285 F.3d 158, 182–83 (2d Cir.2002). We generally defer to a sentencing court's findings as to what a "speaker meant by his words, and how a listener would reasonably interpret those words." *United States v. Shoulberg*, 895 F.2d 882, 884 (2d Cir.1990); *accord United States v. Sanchez*, 35 F.3d at 680. In this case, the district court's conclusion about Gaskin's intimidating intent was supported by evidence of Gaskin's past efforts to ensure Gahr's silence with offers of financial assistance. In short, Gaskin had long recognized the risk presented by Gahr's possible cooperation. With investigative pressure mounting in the aftermath of his arrest, Gaskin's disclosure to Gahr of his plans to kill a cooperating courier necessarily communicated that the same fate could await her if she did not maintain her silence. The district court properly applied a § 3C1.1 enhancement.

### 3. *Possession of a Firearm During a Drug Offense*

Guideline § 2D1.1(b)(1) provides a two-level enhancement for defendants who possess firearms during drug crimes. Bonnie Gahr testified that she saw Gaskin armed with a gun on several occasions when he came to her home to pick up marijuana. Despite the district court's explicit finding that it credited Gahr's testimony, Gaskin argues that no enhancement was warranted because he was acquitted of Count Seven, which charged him with violating 18 U.S.C. § 924(c) by carrying a firearm during and in relation to the charged marijuana conspiracy.

Gaskin's argument is foreclosed by the Supreme Court's decision in *United States v. Watts*, 519 U.S. 148, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997) (per curiam), which holds that "a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence," *id.* at 157, 117 S.Ct. 633. Even before *Watts*, this court had ruled that a § 2D1.1(b)(1) enhancement could be applied to a defendant acquitted of violating 18 U.S.C. § 924(c). *See United States v. Rodriguez–Gonzalez*, 899 F.2d 177, 182 (2d Cir.1990); *accord United States v. Lynch*, 92 F.3d 62, 67 (2d Cir. 1996).

We defer to the district court's credibility finding with respect to Gahr's testimony about Gaskin's firearm possession, *see United States v. Lynch*, 92 F.3d at 67 (crediting testimony of confidential informant that he had seen defendant carrying a gun during narcotics transactions), and conclude that it properly applied a § 2D1.1(b)(1) enhancement.

### 4. *Leadership Role*

Guideline § 3B1.1(a) provides a four-level enhancement "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). Gaskin submits that the district court erred both in finding him an "organizer or leader" and in concluding that five or more persons were involved in his drug transport scheme.

Once again, Gaskin's argument depends on a view of the evidence that is most favorable to him rather than the government. Notably, he eliminates from consideration as participants in his drug scheme all persons who were not themselves convicted or who were involved in the sub-

stantive crimes for which he was acquitted. This approach is at odds with § 3B1.1(a), the commentary to which states that "[a] 'participant' is a person who is criminally responsible for the commission of the offense, *but need not have been convicted.*" *Id.* Application Note 1 (emphasis added); *see United States v. Si Lu Tian,* 339 F.3d 143, 156 (2d Cir.2003).

■ Based on the totality of the trial evidence, the district court reasonably concluded that there were at least eight persons involved in the charged criminal activity; (1) Gaskin; (2) Castle; (3) Gahr; (4) Shaw; (5) the San Diego supplier, Mundahla; (6) Gahr's fellow courier, Ron Ruffin; (7) Kevin Miller; and (8) Miller's fellow courier, "Julie." Indeed, it might have added a ninth participant: the Rochester aide identified by Castle as "Sammy." Defendant need have been an organizer or leader only with respect to any one of these participants for the § 3B1.1(a) enhancement to apply. *See United States v. Si Lu Tian,* 339 F.3d at 156 ("Guidelines only require that the defendant be an organizer or leader of one or more of [the five] participants for the section 3B1.1(a) enhancement to be appropriate."); *accord United States v. Zichettello,* 208 F.3d 72, 107 (2d Cir.2000). Factors relevant to determining whether defendant was an "organizer or leader" include: "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1, Application Note 4.

The testimony of Gahr and Shaw indicated that Gaskin met each of these criteria in managing their drug-related activities. He personally recruited both Gahr

and Shaw to serve as drug couriers in an ambitious scheme to transport large quantities of marijuana cross-country on a regular basis in order to supply Gaskin's Rochester distribution operation. Gaskin planned and organized every detail of these drug transports. He exercised total control over the couriers' conduct, affording them almost no discretion. He expended hundreds of thousands of dollars financing all aspects of the scheme from the acquisition of the drugs to reimbursement of the couriers' travel expenses to covering legal costs. Undoubtedly, he claimed the largest fruits of the crime: all transported marijuana was delivered to him. We do not mean to suggest that only someone who, like Gaskin, so clearly satisfies each and every factor detailed in Application Note 4 qualifies as an organizer or leader. Rather, we highlight this fact to emphasize the patent lack of merit to this part of Gaskin's sentencing challenge. We conclude that a § 3B1.1 enhancement was properly applied.

### G. *Castle's Claim of Ineffective Assistance of Counsel*

Castle contends that he was denied the assistance of counsel guaranteed by the Sixth Amendment. U.S. Const. amend. VI. Specifically, Castle claims that counsel should not have (1) stipulated to Castle's signature on four government trial exhibits or (2) advised Castle to pursue "safety-valve" consideration at sentence, pursuant to U.S.S.G. § 5C1.2.

■ This court is generally disinclined to resolve ineffective assistance claims on direct review. *See United States v. Khedr,* 343 F.3d at 99–100 (and cases cited therein). As the Supreme Court recently reminded us, "in most cases a motion brought under § 2255 is preferable to direct appeal for deciding claims of ineffective assistance" because the district court

is "best suited to developing the facts necessary to determining the adequacy of representation during an entire trial." *Massaro v. United States,* 538 U.S. 500, 123 S.Ct. 1690, 1694, 155 L.Ed.2d 714 (2003). Nevertheless, direct appellate review is not foreclosed. As we stated in *United States v. Morris,* "[w]hen faced with a claim for ineffective assistance of counsel on direct appeal, we may: (1) decline to hear the claim, permitting the appellant to raise the issue as part of a subsequent petition for writ of habeas corpus pursuant to 28 U.S.C. § 2255; (2) remand the claim to the district court for necessary factfinding; or (3) decide the claim on the record before us." 350 F.3d 32, 39 (2d Cir.2003). The last option is appropriate when the factual record is fully developed and resolution of the Sixth Amendment claim on direct appeal is "beyond any doubt" or "in the interest of justice." *United States v. Khedr,* 343 F.3d at 100 (internal quotation marks omitted). This is such a case.

A defendant seeking to overturn a conviction on the ground of ineffective assistance of counsel bears a heavy burden. He must demonstrate both (1) that counsel's performance was so unreasonable under prevailing professional norms that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); and (2) that counsel's ineffectiveness prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694, 104 S.Ct. 2052. *Accord United States v. Campbell,* 300 F.3d 202, 214 (2d Cir.2002); *United States v. Trzaska,* 111 F.3d 1019, 1029 (2d Cir.1997). In applying this standard, a reviewing court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant

must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound [legal] strategy.'" *Strickland v. Washington,* 466 U.S. at 689, 104 S.Ct. 2052 (quoting *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). Paramount to any review of a claim of ineffectiveness is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686, 104 S.Ct. 2052. Castle cannot satisfy the strict criteria of *Strickland.*

 Castle faults his attorney for stipulating to his signature on four trial exhibits: two postal forms relating to a post office box in his name, a signature card for his bank account, and his FBI fingerprint card. As a rule, counsel's decision to stipulate to certain evidence, like his decisions to offer or object to evidence, involves a strategic choice, which is "virtually unchallengeable" if made after thorough investigation. *Id.* at 690–91, 104 S.Ct. 2052; *see United States v. Berkovich,* 168 F.3d 64, 67–68 (2d Cir.1999) (holding counsel's decision to enter into a global stipulation part of a "reasonable trial strategy"); *see also Brown v. Artuz,* 124 F.3d 73, 77 (2d Cir.1997) (identifying "'what evidence should be introduced, what stipulations should be made, what objections should be raised, and what pre-trial motions should be filed'" as matters that "'primarily involve trial strategy and tactics'" (quoting *United States v. Teague,* 953 F.2d 1525, 1531 (11th Cir.1992) (en banc))).

Castle does not contend that counsel's decision to stipulate was not adequately investigated. Instead, he relies on counsel's statement to the district court that he would not have entered into the stipulation if he had known that the government would not call an FBI handwriting

expert as a witness. Counsel explained that the four stipulated signatures had been submitted to the FBI expert as known exemplars of Castle's handwriting for comparison with a disputed signature on a National Car Rental receipt. Counsel entered into the stipulation as a "convenience," expecting to cross-examine the handwriting expert at trial about the qualified nature of her conclusions with respect to the rental receipt signature. Trial Tr., Sept. 25, 2001, at 1887. Some time after the stipulation was read to the jury, the prosecution opted not to call the expert, leaving the jury to make its own comparison of the stipulated signatures and the one on the rental receipt. Counsel complained: "had Al Castle known ... that the expert was not going to be coming in, [he] clearly would not have stipulated to anything." *Id.* at 1888.

Even if we accept counsel at his word, this hardly demonstrates that his stipulation decision was objectively unreasonable at the time it was made. In evaluating the performance prong of an ineffective assistance claim, we do not view the challenged conduct through the "distorting" lens of hindsight but "from counsel's perspective at the time." *Strickland v. Washington,* 466 U.S. at 689, 104 S.Ct. 2052; *see also Lockhart v. Fretwell,* 506 U.S. 364, 371–72, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993) (reiterating "contemporary assessment" rule in applying first prong of *Strickland*). Experienced defense attorneys routinely stipulate to undisputed facts in order to maintain credibility with the jury when challenging other aspects of the prosecution case. Castle's trial counsel cannot be deemed constitutionally ineffective for stipulating to his client's undisputed signatures on certain exhibits simply because he failed to antici-

pate a change in prosecution tactics with respect to a disputed signature on another exhibit.[10]

■ In any event, Castle cannot show that he was prejudiced by the stipulation. Certainly, he does not assert that the government could not have proved that the four stipulated signatures were, in fact, his. Indeed, he cannot even demonstrate prejudice from the prosecution's failure to call the handwriting expert. The district court permitted the defense to elicit testimony that the rental receipt signature had been submitted for handwriting analysis and then to urge an adverse inference in summation from the prosecution's failure to call a handwriting expert. Further, whatever question there may have been about Castle's signature on the rental car receipt, Gahr's testimony and Castle's own credit card records constituted powerful evidence linking him to the Buick sedan from which 285 pounds of marijuana were seized.

■ Castle further faults counsel for advising him to pursue "safety valve" consideration after the jury returned its guilty verdict. Section 3553(f) of Title 18 and its implementing guideline, U.S.S.G. § 5C1.2, provide a "safety valve" from the mandatory minimum sentences applicable in some drug cases, permitting courts to impose lesser sentences upon satisfaction of five criteria. *See generally United States v. Jeffers,* 329 F.3d 94, 97–98 (2d Cir.2003). One such requirement is that a defendant, prior to sentencing, truthfully proffer to the government "all information and evidence" pertaining to his offenses and any related conduct. *See* 18 U.S.C. § 3553(f)(5); U.S.S.G. § 5C1.2(a)(5). To satisfy this provision, Castle admitted that

---

**10.** The district court expressly found that there had been no prosecution misconduct in

procuring the challenged stipulation.

for four years prior to his arrest he had purchased marijuana from Gaskin and then resold it. He further admitted traveling to San Diego in April 1999 with Gaskin, Ruffin, and Gahr for the purpose of acquiring marijuana and transporting it back to Rochester. He admitted renting the Buick used to transport the marijuana seized in Illinois. He also admitted bringing money to Gaskin in San Diego to pay for marijuana that Kevin Miller was supposed to transport.

██ Castle's admissions plainly inured to his benefit. The district court sentenced him to a term of 46 months' incarceration, fourteen months less than he would have received without safety valve consideration. A defense attorney does not render objectively unreasonable representation when he advises his client to act in a way that secures a reduced sentence.

Castle nevertheless insists that he was prejudiced by counsel's advice because his proffer now undermines his ability to challenge the sufficiency of the evidence supporting his conviction. He is wrong. This court addressed his sufficiency challenge in Part II.C of this opinion by reference only to the evidence that was before the jury, giving no consideration to Castle's post-verdict admissions.

Castle's ineffective assistance claim is thus without merit.

## III. *Conclusion*

To summarize, we conclude that (1) the government's failure to secure an indictment within thirty days of Gaskin's arrest did not mandate dismissal of Counts One and Six because these charges, requiring proof of additional elements to the lesser-included charges of the complaint, did not equate to "such charge[s]" as had been filed in the complaint for purposes of applying the Speedy Trial Act's § 3162(a)(1) dismissal sanction; (2) warrantless searches of Gaskin's automobile were rea-sonable under the automobile and forfeiture exceptions to the Fourth Amendment warrant requirement; (3) sufficient evidence was adduced to support the jury's verdicts of guilty against both defendants and the district court's forfeiture order against Gaskin; (4) the district court did not abuse its discretion in deciding not to give a missing witness charge; (5) the district court did not clearly err in concluding, after holding a hearing, that alleged juror misconduct did not require declaration of a mistrial; (6) the district court's reasonable findings of fact and the applicable law support enhancements to Gaskin's sentencing guidelines based on his (a) intended use of a minor to drive a car from a particular location, thereby facilitating a drug delivery, (b) obstruction of justice through communication of an indirect threat to a potential witness, (c) possession of a firearm in connection with the charged conspiracy, and (d) role as an organizer or leader of a drug operation involving five or more participants; and (7) Castle was not denied effective assistance of counsel either by his attorney's trial decision to stipulate to Castle's signature on certain exhibits or by counsel's post-verdict advice that Castle attempt to secure safety valve consideration at sentencing.

Accordingly, we hereby AFFIRM the judgments of conviction.